UNITED STATES, Appellee

v.

JAMES L. RIGGINS, LOUIS M. SUTTLES, and CHASTINE BEVERLY, Privates E-1, U. S. Army, Appellants

2 USCMA 451, 9 CMR 81

453

No. 1641

Decided May 5, 1953

Lt Col George E. Mickel, U. S. Army, and Oscar W. Adams, Jr., Esq., for Appellants.

Lt Col Thayer Chapman, U. S. Army, and 1st Lt Robert A. Forman, U. S. Army, for Appellee.

## Opinion of the Court

**George W. Latimer, Judge:**

Upon joint trial by general court-martial, the accused were found guilty of premeditated murder in violation of Article 118, Uniform Code of Military Justice, 50 USC § 712, and two robberies in violation of Article 122 of the Code, 50 USC § 716. The death sentence was imposed upon all three accused. Army reviewing authorities have upheld the findings and the sentences. The case is before this Court pursuant to Article 67(b)(1), Uniform Code of Military Justice (mandatory appeal), 50 USC § 654. This Article requires that we review all cases in which the sentence, as affirmed by a board of review, extends to death.

The facts which support the conviction of this unfortunate killing and which are clarified by the map below are these: Shortly after midnight on September 20, 1951, one Merle Glass-cock, who resided near Waynesville, Missouri, was driven to his home from the Wagon Wheel Cafe, by Harry Langley, a local cab driver. En route to his home, Glasscock observed three American soldiers walking along the highway (US 66) about three blocks from the Silver Slipper cafe. After leaving Glasscock at his home, Langley "headed back toward the Silver Slipper." At approximately 2:00 a.m. on September 20, 1951, the accused Riggins, accompanied by two other soldiers appeared at a business establishment owned by F. G. Burgard and located on US 66 about one and one-half miles east of "Tower Road." Accused Riggins asked the owner's son to drive the three soldiers to Rolla, Missouri, saying that "they would pay plenty if he would take them to Rolla." The boy refused and the soldiers departed, proceeding east towards Powellville, Missouri, on foot. Early the morning of September 20,

454

* Powellville on Rt. 66. 8 mi. N.E. of Junction Rt. 66 & Tower Rd.
** Rolla on Rt. 66. 35 mi. N.E. of Junction Rt. 66 & Tower Rd.

WAYNESVILLE

SILVER SLIPPER

66

WAGON WHEEL

MILITARY RESERVATION

17

FT. LEONARD WOOD

SPUR LINE S.F. R.R.

BURGARD'S PLACE

ELLIS ASLEEP

CAB FOUND

TOWER RD.

LANGLEY FOUND

28

LOST HILL

SCENE OF CRIME

DRY CREEK BED

BIG PINEY RIVER

BIG PINEY RIVER

R.R.

66

* TO POWELLVILLE→
** TO ROLLA→

1951, Corporal Mervin C. Ellis was returning alone by car to Fort Leonard Wood, Missouri. Becoming tired, he pulled to the side of the highway (US 66) at a point about one-half mile east of Mr. Burgard's establishment and fell asleep. Ellis awoke about 2.30 a.m. to find accused Riggins sitting beside him in the driver's seat and two other soldiers occupying the rear seat of the car. Overriding a vigorous protest by Ellis, Riggins turned the car around and drove back towards Rolla, Missouri. When one of the soldiers in the back seat observed that they could not let Ellis go "because . . . (he) knew too much," Ellis realized he was in danger. Subsequently, Ellis succeeded in

**455**

escaping from the car near Powellville, and informed the State Police of the loss of his car. Within a few minutes the stolen car was overtaken and halted by a Missouri State Police patrol car. Riggins, Suttles, and Beverly, the three accused, were in the car.

All three of the accused are Negro soldiers. When apprehended, each was attired in a cotton khaki uniform. Beverly had no cap, and none was found in the car. The uniform of each was spattered with blood. Beverly had over $155.00 in varying denominations jammed into his pocket and although he was carrying a billfold, there was no money therein. Riggins had $7.00 in his possession but Suttles was without funds. When questioned concerning the bloodstains, one of the accused, in the presence of the others, said that they had "got the blood on them by falling down on Tower Road."

At about 9:00 a.m. September 20, 1951, Harry Langley's taxicab was found about one mile south of Route 66 on a country road known locally as "Tower Road." The cab was in the ditch and disabled. The condition of the interior of the taxicab was such as to indicate that an act of violence had taken place. Concern over Langley's absence grew during the day, and the following day (Friday), a large search party was organized. That afternoon Harry Langley was found wandering in a wooded area south of Route 66. He had been badly beaten, he was covered with blood, and he was dazed. Langley was taken to a nearby hospital and expired the following day.

The scene of the crime had been located by the searchers near the place where Langley was found. It was apparent that a violent struggle had taken place. Langley's hat, empty billfold and personal papers were scattered in the area. A large pool of blood was there, as well as four large rocks encrusted with blood and hair. An Army garrison cap was found near the pool of blood.

Between the time of the discovery of Langley and the time of his death, Langley had periods of consciousness and unconsciousness although remaining in a state of extreme shock. During intervals of consciousness, Langley managed to say that "they beat me," that three Negroes had beaten him, and that he had over $150.00 on his person at the time of the assault.

Medical examination of Harry Langley revealed that he had received a vicious beating and that his death was caused by multiple cranial injuries. Doctor Hanan, the pathologist who performed the autopsy upon deceased, found no less than six separate recent substantial injuries upon the trunk of the deceased. Doctor Hanan found no less than six separate fractures of the skull of the deceased, distributed over five separate areas of the skull. Two of these fractures were caused by blows so severe as to literally drive pieces of the skull into the brain. One fracture was so extensive in length as to completely traverse the skull from front to rear. The areas around both eyes of the deceased were horribly bruised and multiple fractures of the nasal bones were observed. These injuries could have been caused by blows struck with rocks similar to the blood-encrusted rocks found at the scene of the crime.

It was shown by expert testimony that the blood spattered on the four rocks was of the same type as the victim's blood and the hairs found on the rocks were similar to his hair. Further, the hairs found in the garrison cap found at the scene were similar to accused Beverly's hair.

Each of the accused made a voluntary pretrial statement. In the statements each admitted being present at the scene of the assault upon Langley at the time the assault was committed, the taking of the taxicab, and the washing of his clothes as soon after incarceration as possible. Also, each accused the other two of having struck the fatal blows. Suttles admitted participation in the assault. Beverly admitted that he took and rifled Langley's billfold.

While Beverly was being interrogated he was shown the garrison cap (containing no inside markings) which had been found at the scene. He was asked if the cap was his. Although Beverly had been given no opportunity to examine the inside of the cap, he replied,

456

"No, all my clothes are marked and that [cap] doesn't have any markings in it." Examination showed the cap to be unmarked.

While the accused were incarcerated pending trial, Riggins attempted to pass a note to the other two in which he suggested a concocted story concerning the Langley incident "to keep from getting life."

Appellate defense counsel in support of their contentions have advanced four assignments of error which will be discussed seriatim.

I

The first assignment of error is that the evidence is insufficient to support the conviction of each of █ the accused as a principal in the premeditated murder of Langley. Obviously this is without merit. Suttles admitted active participation in the assault which caused the death of the victim. Beverly admitted robbing the victim during the course of the assault. His cap was found not more than two feet away from the spot where apparently Langley was knocked to the ground by his assailants. His clothing was spattered with blood when he was apprehended. Riggins admitted that he drove Langley's taxicab to the scene of the crime. He inquired as to whether the victim had any money while the accused were walking toward the highway and was told by Beverly that he did and was shown a number of twenty dollar bills. Riggins took the lead in robbing Ellis of his car at a time when the accused were fleeing from the scene of the assault upon Langley. His clothing was blood-spattered after the offense. In effect, he admitted his complicity in the murder in the note which he passed to his cohorts. Langley in his last hours stated that he had been assaulted by three Negroes. The location and condition of the four rocks indicated they were used in the assault upon the victim. He had been struck often and forcibly. He was a middle-aged man in good health when last observed and the physical evidence at the lonely scene indicated that he had put up a violent struggle. We conclude that the evidence is sufficient to support the finding that each accused actively participated in the preconceived assault upon and robbery of the victim. The fact that much of this evidence is circumstantial is immaterial. United States v. Jarvis (No 94), 3 CMR 102, decided May 6, 1952.

II

It is urged upon us that the law officer should have informed the members of the court-martial re- █ garding the law on aiders and abettors as principals. Undoubtedly each of the accused could have been convicted as an aider and abettor in the commission of the crimes ·of premeditated murder and robbery by another. Manual for Courts-Martial, United States, 1951, paragraph 156, pages 302–303. However, the law officer, by failing to instruct in this regard, held the prosecution to a higher standard of proof than was actually required. Moreover there was no request for any such instruction. In United States v. Marshall and Shelton, (No 548), 6 CMR 54, decided November 14, 1952, we had the following to say on this matter: "If defense had desired an instruction on the acts necessary to involve one who assists in but does not complete the acts alleged as a principal through an aider and abettor theory, there was ample opportunity for such a request. However, in view of the evidence, we think that defense probably preferred to have the court informed that they must find actual participation in the act of intercourse [and here, deadly assault] in order to convict."

· III

The next assignment of error raises the question as to whether the law officer erred in failing to in- █ struct on the lesser included offense of unpremeditated murder. After both the prosecution and defense had rested, the law officer instructed on premeditated murder, robbery, the presumption of innocence, burden of proof, reasonable doubt, and reasonable doubt as to the degree of guilty. He defined premeditation, and at the request of defense counsel, he instructed on involuntary manslaughter. After the law officer concluded his instruc-

tions, defense counsel expressly stated that he had no other instructions to offer.

In United States v. Clark, (No 190), 2 CMR 107, decided February 29, 1952, we said:

". . . . Correct procedure under military law requires that, unless the evidence excludes any reasonable inference that a lesser crime was committed, the duty of the law officer is to carve out instructions covering the offense. He is the judge in the military system and he must furnish to the court the legal framework of all offenses which the evidence tends to establish. Unless he does so the accused has been denied a right which we conclude was granted by Congress and error as a matter of law follows."

Applying this test to the case at bar we are satisfied that the evidence does not raise any issue as to the lesser included offense of unpremeditated murder. The offense of premeditated murder is shown conclusively. If the accused did not commit that offense, they did not commit any. We have no desire to marshal the evidence a second time as it so unerringly points to a concerted and premeditated murder without excuse or provocation that the court-martial could not have rightly returned any verdict other than the one it did. Many reported cases are similar to this case on both the law and the facts and buttress us in our conclusion that unpremeditated murder was not raised reasonably by the evidence in this case. People v. Alcade, 24 Cal2d 177, 148 P2d 627 (1944); People v. Dorman, 28 Cal 2d 846, 172 P2d 686 (1946); People v. Green, 13 Cal2d 37, 87 P2d 821 (1939); Jefferson v. State, 196 Ark 897, 120 SW 2d 327 (1938); State v. Holland, 354 Mo 527, 189 SW2d 989 (1945); Henderson v. State, 135 Fla 548, 185 So 625 (1938).

It is urged upon us that where the evidence is circumstantial and the charge is murder, the law officer has a duty to instruct on all the degrees of homicide. We are cited to several civilian jurisdictions which appear to adhere to that rule. We shall assume for the purpose of this contention that the evi-

dence as to all three accused is circumstantial. We have examined the cases cited in support of the rule contended for but we prefer to adhere to the rule enunciated in the Clark case, supra. It is worthy of note that we have heretofore applied the rationale of that case to other murder cases, whether the evidence was circumstantial or direct, or a combination of both. See United States v. Roman, (No 191), 2 CMR 150, decided March 19, 1952; United States v. Quisenberry, (No 329), 5 CMR 98, decided September 9, 1952; United States v. Hunter, (No 359), 6 CMR 37, decided October 17, 1952; United States v. Long, (No 529), 6 CMR 45, decided October 17, 1952. As the circumstances are pieced together in this record, a picture of a cruel and barbaric killing is painted and no crime less than premeditated murder is reasonably raised. Failure or refusal, therefore, to instruct on unpremeditated murder was not error.

IV

After the court-martial was convened, and prior to the exercise of the right to challenge by either party, trial counsel notified the court members of the nature of the offense, that conviction permitted imposition of the death penalty and inquired if any member of the court had any conscientious objection to the death penalty. The president thereupon closed the court for a conference. After conferring among themselves for approximately five minutes, in the absence of the law officer and the parties, the court-martial opened. The president then announced in open court that he had apprised the other members of the gravity of the court's responsibility; that he had cautioned them to decide on the basis of the evidence presented unswayed by their emotions; that he had polled the members concerning their conscientious scruples against imposing a death sentence; and that no member had expressed a view that he would not impose such a penalty in a proper case. Defense counsel—and there were the regular defense counsel, assistant defense counsel and special defense counsel—all lawyers, then proceeded to conduct voir dire examination to determine

whether any member had formed or expressed any conclusion concerning the case. They did not express any dissatisfaction with the action of the president described above nor did they challenge the president or any member of the court preemptorily or for cause.

Appellate defense counsel now urge on us the arguments that the rights of the accused were prejudiced because the president's actions unduly impressed the court-martial members with the seriousness of the offenses charged; that the accused were denied their right to be face to face with members while they are examined as to their qualifications; that the president's actions reveal that he was attempting improperly to influence the other members of the court-martial; and, that the president usurped the functions of the law officer.

We first desire to make it perfectly clear that there is no basis for this procedure under the present Code. However, the problem of whether the president's action was prejudicial is not so easily resolved.

We do not believe that the members of the court-martial were unduly influenced by any reference to the magnitude of the offenses charged. Each member had a copy of the charges and specifications which alleged premeditated murder, a serious and heinous offense. Trial counsel had already advised the court-martial members concerning the maximum possible sentence and stated the nature of the offenses alleged. The very nature of trial counsel's question concerning conscientious objections to the imposition of a death penalty brought home to the court-martial members the fact that the prosecution would ask for the death penalty in the event of conviction. That members of the court were saddled with a grave responsibility cannot be gainsaid and so it is difficult to find any fault with what was said.

We next turn to the contention that the accused were denied their right to be face to face with the members of the court while they were examined as to their qualifications. In Hopt v. People of Utah, 110 US 574, 28 L ed 262, 4 S Ct 202 (1884), the Supreme Court of the United States said that the defendant must be personally present while the prospective jurors' qualifications are determined because "The prisoner is entitled to an impartial jury composed of persons not disqualified by statute, and his life or liberty may depend upon the aid which, by his personal presence, he may give to counsel and to the court and triers, in the selection of jurors." In this case these accused were present while voir dire examination was conducted. Their counsel was given every opportunity to inquire into every facet of the qualifications of the various court-martial members. No limit was placed by the law officer on this examination. The right of the accused to challenge the various members was not curtailed in any way. The law officer was very careful to make certain that each accused was prepared to go on with the trial and he was assured that the defendants were prepared to proceed before the taking of testimony commenced. Because of these factors and because defense counsel did not challenge the president of the court-martial, did not indicate any dissatisfaction with the procedure followed, did not raise the matter until the case was on appeal, and does not suggest now that any member of the court was biased or prejudiced by the remarks, we must conclude these accused were tried by an impartial court.

The allegation that the president usurped the function of the law officer and attempted to control the decision of the court-martial is not justified by the record. We have previously said that we would view any abdication by the law officer of his statutory duties, any attendant usurpation of these duties by the president, and any action occurring during trial which tends to show any attempt to exercise command control with stern suspicion. United States v. Berry, (No 69), 2 CMR 141, decided March 18, 1952. We cannot view the president's participation in this case to run afoul of our holdings.

There is nothing present in this record to suggest that he was attempting to control the court-martial. His re-

**459**

marks to the court members were proper in substance even though undesirable as a matter of good procedure. The record bears testimony to the effect that he was not trying to step out of character as president of the court. The testimony requires 700 pages to record. More than six days were required to complete the trial. Many issues were hotly contested. The members of the court-martial deliberated on findings for a considerable length of time. A visit to the alleged scene of the crime was undertaken. The president propounded questions to witnesses but so did other members of the court. He did not step beyond the bounds of propriety in the questions he asked nor did he attempt to usurp the functions of the law officer. He gave no indication of his reaction to the testimony as it was adduced. Only once did he object to a question asked by one of the parties, and then only because, as he announced, he believed that trial counsel was unduly harassing a witness for the defense. We conclude that the president's departure from authorized procedure was motivated by a belief that he should assist in assuring a fair and just trial to both sides. We have already pointed out that his remarks were proper in substance. He erred but not to the substantial prejudice of the accused.

Accordingly, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge BROSMAN concur.