UNITED STATES, Appellee

v.

HENRY PARKER, JR., Private First Class,
U. S. Army, Appellant

6 USCMA 75, 19 CMR 201

No. 5759

Decided June 24, 1955

Lt Col George M. Thorpe, U. S. Army, and 1st Lt Robert C. Taylor, U. S. Army, for Appellant.

Lt Col Thomas J. Newton, U. S. Army, and 1st Lt A. Kenneth Pye, U. S. Army, for Appellee.

GEORGE W. LATIMER, Judge:

I

This case arrives before us both under mandatory review provisions of Article 67(b)(1) of the Code, 50 USC § 654, which governs cases where the death penalty has been adjudged, and through a petition for new trial filed with The Judge Advocate General of the Army and referred to this Court as provided by Article 73 of the Uniform Code of Military Justice, 50 USC § 660. A general court-martial convened in Germany found the accused guilty of two offenses of rape, alleged as violations of Article 120 of the Code, 50 USC § 714, and one offense of assault with intent to commit rape in violation of Article 134 of the Code, 50 USC § 728. Because the accused's life is at stake, we have considered every substantial ground of error which we find in the record. Preliminary to discussing the merits of the appeal, we deny the petition for new trial for reasons which will become apparent as we develop our grounds for granting a rehearing on the mandatory review. We will discuss only those facts necessary to an understanding of the issues raised.

II

Our resume of the facts will disclose there is ample evidence in the record to support the findings that accused committed three heinous offenses. However, in connection with our recitation of those facts concerning the substantive offenses it must be borne in mind that we relate the testimony furnished by the Government witnesses, as no defense witnesses were called. On the evening of November 17, 1953, a thirty-two-year-old married German woman, Luise Zacharevics, had a dispute with her husband and left their apartment in Augsburg to take a walk. She was accosted by a young American Negro soldier, who was riding a bicycle, and who made repeated advances toward her. She repulsed him and he left, but only momentarily, for he soon returned without his means of conveyance and resumed his attempts to persuade her to accompany him elsewhere. She became frightened but continued walking, with the soldier following at her side. He tried to direct her down a side street, but she resisted. Becoming terrified, she began knocking on the doors of homes and business houses along the street but received no reply. She finally reached an intersection and looked around for a lighted residence to which she might escape. At that point, the soldier seized her, forced her into a small side street, interrupted her screams by covering her mouth with his hand, and threw her to the ground. Although he had constantly threatened her with violence, she resisted him and pleaded to be released. Finally, he struck her with his fist and, after a struggle which exhausted her, he accomplished sexual intercourse against her will. After the assault, the soldier followed her to the street, but she escaped from him when a stranger approached. She was helped to a telephone, the police were notified, and she was given medical treatment. The following day, in a written statement, she gave the police a complete account of the incident.

Three days later, on November 20, 1953, at about 11:00 p.m., a German woman, Jutta Muehlbacher, was walking from the Stadtbergen streetcar terminal in Augsburg toward Deuring. At the outskirts of town, just beyond the last houses, she was passed by a man on a bicycle coming from the opposite direction. A few minutes later, the bicyclist passed her going in the same direction. Soon after the second passing, she noticed the lights on the bicycle go out and she became apprehensive. She left the road and started across a meadow so as to give wide berth to a patch of woods ahead and to her left. As she drew even with the woods, a man stepped out and advanced toward her. She started to run in the opposite direction and cried out for help. Her attempt to flee was useless; she was caught from behind and her cries were cut off by the thrust of a hand into her mouth. She was forced to the ground and her attacker

**79**

attempted sexual intercourse with her. She resisted him furiously, and fortunately her resistance was more successful than her flight. After a bitter struggle, she was able to prevent accomplishment of the act, and after his attempts were frustrated the assailant released her. She left the field, ran to Deuring, aroused the wife of the postmaster, and notified the police. It was a moonlit night, and she was able to identify her attacker as an American Negro soldier. In addition, she furnished a few other details of description.

Some two months elapsed before the occurrence of the next incident which concerns us. On January 23, 1954, Miss Lora Stuhlmueller left work at 8:00 p.m. and began walking to her home. The path was dark and as she rounded a curve she heard footsteps behind her. She became frightened and started to run. When she came to an illuminated area near a railroad crossing, she glanced back and saw that it was a Negro soldier following her. She continued to run but was soon overtaken by her pursuer. He grabbed her from behind and began beating her with his fist. She screamed for help, but he thrust his fingers into her mouth and silenced her. In the fight to free herself, she fell to the ground and she and her attacker rolled to the bottom of a small hill. He resumed his violence and when she was exhausted from the struggle he completed the sex act. He then arose and with the aid of a flashlight began searching the ground for his hat and her belongings. When the opportunity presented itself, she fled to a nearby house and collapsed. The police were notified, and she was given medical treatment.

### III

In some way not apparent from the record, the accused came under suspicion as the guilty party and on the day following the last assault, after being advised of his rights under Article 31 of the Code, 50 USC § 602, he was questioned by the military investigators. His responses satisfied the investigators that he was the one who committed the assault upon Miss Stuhlmueller.

In addition, the accused's statements aroused their suspicions that he was responsible for a number of other similar sex offenses which had been perpetrated in the vicinity.

Three days later, the accused was accompanied to Criminal Investigation Detachment headquarters by Captain Gamble, who apparently was used by his organization to investigate serious offenses. In this instance the Captain, as will be later observed, played the role of a criminal detective. According to the testimony of the investigators, Article 31 was read and explained to the accused, and he orally confessed to the rape of Lora Stuhlmueller. His incriminatory statements were made in the presence of Captain Gamble, Sergeant Stanton, and Corporal Kneeland of the Criminal Investigation Detachment. Later in the day, one Sergeant Boatner of the Criminal Investigation Detachment was called in and he became the interrogator. He apparently was used because he was trying to fix responsibility in other sex cases in which the assailant's modus operandi bore a strong resemblance to that used by the attacker in the Stuhlmueller incident. He claims that the accused, in the presence of Captain Gamble, told him that he, the accused, had committed other offenses in the general area and although he was uncertain of the dates, he offered to point out the places at which they occurred. A quarter-ton truck was obtained and the accused directed Captain Gamble and Sergeant Boatner to a spot outside Deuring where he reportedly confessed to an assault which was similar to the one made on Jutta Muehlbacher. He also directed them to other spots at which he had had sex relations with German women, but we are not concerned directly with those incidents in this case. He called attention to a bicycle shop and stated that he had rented bicycles there. He was also questioned about the attack upon Mrs. Zacharevics, but he denied any knowledge of that assault. She, however, identified him while he was in a lineup of soldiers at Criminal Investigation Detachment headquarters.

## IV

Having stated the facts touching on the substantive offenses in a light most favorable to the Government, we pass on to deal with the important question in this case. That is, does the record show a substantial compliance with the Code or does it establish a proceeding so shallow and synthetic as to amount to an empty and hollow ritual? In the view of appellate defense counsel, the principal error is inadequate representation by trial defense counsel, but the question is much more sweeping than that. In a broad way we find ourselves faced with a grotesque and distorted legal mosaic, yet when we separate it into its component parts and view them separately each appears to be only slightly twisted. Stated conversely, and in the language of the law, each individual error which we find does not equal a denial of due process of law, but when they are massed into one conviction and sentence their cumulative effect resulted in an unfair and unjust proceeding. In our development of this issue we shall treat the errors and irregularities in the sequence in which they appear in the record, beginning with the preferment of charges.

## V

Article 32 of the Uniform Code of Military Justice provides:

"(a) No charge or specification shall be referred to a general court-martial for trial until a thorough and impartial investigation of all the matters set forth therein has been made. This investigation shall include inquiries as to the truth of the matter set forth in the charges, form of charges, and the disposition which should be made of the case in the interest of justice and discipline.

"(b) The accused shall be advised of the charges against him and of his right to be represented at such investigation by counsel. Upon his own request he shall be represented by civilian counsel if provided by him, or military counsel of his own selection if such counsel be reasonably available, or by counsel appointed by the officer exercising general court-martial jurisdiction over the command. At such investigation full opportunity shall be given to the accused to cross-examine witnesses against him if they are available and to present anything he may desire in his own behalf, either in defense or mitigation, and the investigating officer shall examine available witnesses requested by the accused. If the charges are forwarded after such investigation, they shall be accompanied by a statement of the substance of the testimony taken on both sides and a copy thereof shall be given to the accused."

The Supreme Court of the United States in the case of Humphrey v. Smith, 336 US 695, 93 L ed 986, 69 S Ct 830 (1949), held that a failure to grant an accused a thorough and impartial pretrial investigation as required by Article of War 70, 10 USC § 1542, the predecessor Article to Article 32 of the Code, before referring charges to a general court-martial for trial, did not deprive the court of jurisdiction. That decision was not unanimous but unanimity was achieved on the premise that an impartial pretrial hearing is a substantial right which should be accorded an accused. We have previously announced the same principle, United States v. Rhoden, 1 USCMA 193, 2 CMR 99, and we frown on attempts to whittle it away by merely going through the formality of filling in the blank spaces on a form. We, therefore, start with the premise that a record discloses error when it shows that a perfunctory and superficial pretrial hearing was accorded an accused.

While we have used the foregoing principle as a starting point to determine the presence of error, the following facts and circumstances will indicate how seriously the rule was breached in this instance. Captain Eugene C. Gamble was a "serious incident investigating officer" for his unit. He apparently had been detailed to assist in tracking down the sex fiend in this series of offenses and he first appears as attempting to extract a confession from the accused on January 24, 1954. Three days later, on January 27, 1954,

he met alone with the accused and during the course of his conversation he importuned Parker to confess. He did not offer him any illegal inducement but he was seeking to supply the missing links in the chain of incriminating circumstances and he may have been extravagant in some of his statements. When he had convinced the accused of the desirability of making a full confession, he assisted in obtaining from him the details about the particular crimes set out in the specifications. In addition, he sought to fix criminal responsibility on the accused for other serious offenses which had been reported. After meeting with success in obtaining the incriminating statements, he, with other investigators, accompanied the accused to the scenes of the reported crimes, noting in detail the corroborating circumstances. It strikes us as being more than a happenstance that on the same day he obtained the clinching evidence, he was appointed as pretrial investigating officer.

From what has been said it is apparent that the military authorities concluded Article 32 called for no more than having a criminal investigator, who had uncovered enough evidence to satisfy himself that the accused had committed the offenses, reduce his belief to writing. If that alone does not fix this alleged pretrial hearing as a shallow gesture by an interested officer, we call attention to the fact that a statement by that selfsame Captain is listed as one of the exhibits which was used to influence him in his recommendation. It is most difficult for us to ascertain how, or in what way, a person who is used as the chief architect to outline a case against an accused can be considered fit to act as an impartial pretrial investigator. Civilian cases cannot be used as analogues because of the command structure in the military, but the selection made in this instance is far worse than detailing a police detective, who has developed a criminal case for trial, to act as committing magistrate in a preliminary hearing in a civilian court.

Proceeding further with the facts of the so-called pretrial investigation, the report of the investigating officer shows

that the accused was not informed that any statement made by him, at the alleged hearing, might be used as evidence against him in a trial by court-martial and yet on the Form DD 457 captioned "INVESTIGATING OFFICER'S REPORT" the reporting officer states: "Subject accused admitted to offenses as charged." That comment gives a definite clue that no hearing within the contemplation of Article 32 was conducted. All that occurred was simply this. Captain Gamble, who by his action here established himself as a member of the detective crew, assembled the results of their efforts into a single package and labelled it a pretrial investigation. Moreover, while the form shows the accused was advised of his rights to counsel, in the column which should carry the information as to his decision regarding representation, we find no entry. We do, however, note that where the form called for the identity of the counsel requested by the accused, there is typed in the letters "NA" which we assume means not applicable. Furthermore, the same "not applicable" comment is set out in the space provided for the name of counsel made available by the officer exercising general court-martial jurisdiction. Of course, those entries, plus the omission, strengthen our belief that the investigating officer's preinvestigation efforts were considered a satisfactory substitute for the pretrial hearing. If that is an apt conclusion, and the accompanying papers support it, we can well understand why the officer's report would show accused made no request for counsel, and why the reporting individual concluded that having counsel present to represent the accused was a matter of no importance, as the hearing was over when the confession was obtained.

From the dates of the report, the statements attached, the testimony at trial, and the comments indorsed on the form, we are forced to conclude that this pretrial investigation consisted of no more than having one of the crime detectives collect his assembled evidence, fortify it with a written account of his own detective activities, fill in the blank spaces on the form and forward the bundle to higher headquarters.

Any other conclusion is not reasonably inferable from the record that is presented to us and we cannot accept what we find here as a substitute for a pretrial investigation. It may be that the record fails to reflect the true situation but even if we were to augment the record by making unwarranted assumptions in favor of the Government, the hearing would not meet the spirit or the letter of the Code. To the dubious, we suggest they view the Army's motion picture "The Investigating Officer" and then scan this record. If they find any similarity it will indeed be slight as nowhere does it appear that Article 32, as understood by that service, was followed in this investigation. While we do not consider this shortcoming a question of jurisdiction, United States v. Rhoden, supra; United States v. McCormick, 3 USCMA 361, 12 CMR 117, we believe error is clearly present and in a case involving offenses which carry a death penalty, it cannot be tossed aside lightly. United States v. Welch, 1 USCMA 402, 407, 3 CMR 136; United States v. Dupree, 1 USCMA 665, 669, 5 CMR 93. Furthermore, assuming arguendo that we have too narrowly interpreted the record, the interest Captain Gamble had in solving these mysteries and insuring an ironclad conviction of the wrongdoer would alone cause us to question seriously his selection as an impartial arbitrator. Clearly, there was not even a token compliance with Article 32 and this error served to magnify those which followed.

## VI

On January 29, 1954, the officer exercising general court-martial jurisdiction ordered the case referred for trial to the general court-martial appointed by paragraph 14, Special Orders Number 19, Headquarters, 43d Infantry Division, dated January 25, 1954. However, the accused was not tried by that court, as on February 8, 1954, a new court was ordered to convene at the same headquarters at 9:00 a.m., February 9, 1954, for the trial of this accused only. That court was brought into existence one day before trial and parenthetically we note that the rank of president of the court was unusually high, as a brigadier general, who commanded the Division Artillery of the Infantry Division in charge of the proceedings, was selected as the senior member. That may have no significance other than that the Division Commander wanted a well-manned court because it was to consider a capital case, but it is not beyond the realm of fair inference to suppose that he sought to use this case as a vehicle for other purposes. We must give the convening authority the benefit of the doubt as to his motives in picking a powerful court for an isolated trial, but we need not close our eyes to the fact that if he was particularly concerned about prosecuting this case, he did not have the same concern about protecting the rights of the man charged with the offense. In total disregard of a reasonable time factor, he ordered the case to be tried within twenty-four hours of the time the order was published and it must be noted that newly selected trial and defense counsel were appointed by him to represent the Government and the accused. While we cannot state categorically that defense counsel had not contacted the accused prior to counsel's appointment, we can say the record does not furnish us with circumstances showing the contrary. United States v. Helwig, 159 F2d 616 (CA 3d Cir) (1947). In a desire to process this litigation with haste, it seems to have been forgotten that an attorney who is to defend an accused for a capital offense ought to have some time for preparatory action. Powell v. Alabama, 287 US 45, 53 S Ct 55, 77 L ed 158. If the issues involved were of sufficient importance to justify ordering a specially selected court, the gravity of the situation imposed on defending counsel the duty fully and conscientiously to probe all reasonable avenues of defense, extenuation and mitigation. If done properly, that is time consuming.

In connection with our development of the deficiency in representation accorded this accused, we pause to make one comment. While we have overruled the petition for new trial and we do not accept most of the statements contained in the supporting affidavit, we find the record woefully insufficient to present

**83**

the issue in the best light for the Government. The accused has stated under oath many facts supporting his contention that he was not properly defended, and he has asserted a failure of counsel to consult adequately with him prior to trial. In so far as his assertions are unbelievable or improbable, or are explained or disputed by the record, we discard them; but where there is no other information and his believable statements are without refutation, or the record inferentially supports his assertions, we have little reason to deny them weight. For the protection of trial defense counsel and ▮ the Government, and for the benefit of this Court, when an accused makes allegations in a petition for new trial, which must of necessity be refuted from sources outside the record, it would be very helpful to have the Government furnish facts to support its side of the controversy. In this connection we call attention to the case of United States v. Riggins, 2 USCMA 451, 9 CMR 81. After that decision was affirmed by this Court, the three accused began an action in Federal District Court for the District of Kansas. They predicated their petition for a writ of habeas corpus on inadequacy of representation of counsel and supported it by averments in the petition. The Government filed counter affidavits showing the quality of the representation which had been accorded to them and the facts so developed placed the issue in its proper perspective. See Suttles v. Davis, 215 F2d 760 (CA 10th Cir) (1954).

The difficulty we encounter in this particular instance is that if we accept the record on appeal as the basis for determining the time defense counsel entered upon his defense of the case, we find, as previously indicated, that he was appointed not more than one day prior to trial. The time of his actual selection is not shown and we are asked to note that counsel are quite often active in a case before the order is issued. We are familiar with instances where that has occurred, but that does not help us determine the true situation in this case and it would have been a simple task to have informed us fully. We cannot judicially note that ▮ this defense counsel acted prior to appointment for the record is silent as to any standard practice in that regard and the scope of his efforts at trial give no indication of extensive pretrial preparation. Actually, the information most helpful to the Government comes from accused's affidavit and if we accept that we are told defense counsel interviewed him once for a period of less than thirty minutes three days prior to trial and that on no other occasion prior to the commencement of the proceedings was the accused in contact with his counsel. True, the number of consultations may not be a fair measuring rod, if the record permits an inference of other pretrial preparation, but absent any basis for that inference, it is the only measuring device we have. Giving the Government the benefit of the most favorable evidence by assuming the selection of counsel was made three days before trial, that short a period alone indicates the convening authority had little appreciation of the time which ought to be made available to counsel to prepare a case involving a possible death sentence.

One additional item bears mentioning. It is to be noted that the convening authority appointed ▮ only one defending counsel. Article 27 of the Code, 50 USC § 591, provides that for each general court-martial the convening authority shall appoint defense counsel, together with such assistants, as he deems necessary or appropriate. Now we do not imply that the convening authority does not have the discretion to appoint a single defense counsel. However, we seldom see a general court-martial organized without a defense assistant and we believe that in those capital cases which must be tried on short notice, proper representation requires his appointment. Therefore, if reasonably possible, two counsel with defense experience should be detailed to the court. Particularly is that important if haste is demanded and here speed seemed to be the essence of this conviction.

We express one further comment in

connection with the appointment of this court. While the record ■■■■■■ ■ shows trial counsel notified the court that the accused had not made a request in writing that enlisted men be detailed as members of the court, the entire record including the allied papers is entirely barren of any showing that he was ever advised he had such a right. Here again accused makes an averment that he was never informed of that right and his assertion remains unrefuted. We, of course, recognize that the request must be made prior to the convening of the court, but if an accused in the lower intelligence bracket is not informed, the in-court discussion would hardly put him on notice that he had waived a right. In view of the composition of this court that right might have been particularly valuable.

We have previously held that haste alone is not ipso facto prejudicial to an accused, United States v. Vigneault, 3 USCMA 247, 252, 12 CMR 3, but from the facts of this case it appears that the military authorities so accelerated the prosecution that there is more than a fair risk the accused was denied a fair trial. This adds one more error to undercut this conviction and sentence.

## VII

Before presenting our views on the trial phase of this controversy, we mention the test we have previously ■■■■■■ ■ ously used to determine inadequacy of representation. Our language in United States v. Bigger, 2 USCMA 297, 8 CMR 97, will suffice for this purpose. There we stated:

". . . It is not unusual for losing litigants to lay the blame for their conviction on the doorstep of those who represent them and this case varies little from the usual pattern. The charges are sweeping, but there is no evidence to sustain them. At most they are assertions in the brief on appeal, unsupported by any appropriate and relevant facts. We have previously disposed of similar contentions in United States v. Hunter (No. 359), 6 CMR 37, decided October 17, 1952. We there held that where the record shows that accused has been provided with qualified defense counsel pursuant to the provisions of Article 27 (b), Uniform Code of Military Justice, 50 USC § 591, in order to support a contention that his rights were not properly and adequately protected, he must 'reasonably show that the proceedings by which he was convicted were so erroneous as to constitute a ridiculous and empty gesture, or were so tainted with negligence or wrongful motives on the part of his counsel as to manifest a complete absence of judicial character. See Diggs v. Welch, 148 F2d 667 (C.A. D.C. Cir.).'"

The Government on appeal has furnished us with this information. Trial defense counsel held the rank of captain and was certified in accordance with the provisions of Article 27 (b) of the Code. His experience included duty as Assistant Staff Judge Advocate at an infantry division headquarters; and in addition to acting as defense counsel, he had acted both as law officer and trial counsel. Further, he was a graduate of an accredited law school and had actively practiced law for twelve years in the State of Maryland.

Because we are critical of defending counsel in this case does not imply that we are questioning his ca- ■■■■■■ ■ pabilities to defend other cases. We recognize we are treading in a sensitive area and, of course, we do not have accurate—in fact, not any—information on the many obstacles which may have confronted him. Furthermore, we have no desire to second guess him. But as we hope to point out, inadequate representation is shown by all information made available to us. We lay only part of the blame at the door of counsel for we accord to him the benefit of the fact that he was working with a most difficult case under what appears to have been a climate distinctly unfavorable to the accused. The fact remains that regardless of who must bear the burden, this accused received no more than a perfunctory hearing and in good conscience a death sentence should not stand on such an unsubstantial trial.

First, we mention that the prelimi-

nary matters after the court was convened, and the taking of testimony, consumed only two hours and nineteen minutes. Six witnesses were called by the prosecution and one by the accused on a preliminary matter. Four of the witnesses testified through an interpreter and that usually slows up the taking of testimony. Now we are not possessed with sufficient insight to know what facts, if any, could have been brought out which would have been favorable to the accused, but we sense from the cross-examination of Government witnesses that defense counsel had not consulted with them prior to trial as their answers to his questions, for the most part, strengthened rather than weakened the prosecution's case.

Second, we find a total lack of the tactics and technique usually employed by defending counsel in criminal cases. There was no attempt to examine any court member on voir dire and we see some areas which were worth probing. Furthermore, no peremptory challenge was exercised and while it is argued that to have removed a court member might have hurt the accused by reducing the membership of the court, that argument is not persuasive. Leaving an individual on a court who might be subject to a challenge for cause, or a choice morsel for a peremptory challenge, can hardly be characterized as good trial strategy. After all, this was a specially selected court and their knowledge about the case, their views on the death sentence, and whether there had been any discussion about the necessity for severe punishment might have offered a clue to the removal of at least one member. There was a reason for the special court, and to do nothing, as did this counsel, was not only questionable but also the only tactic regularly indulged in by the defense.

During the taking of testimony only two objections were made and they were interposed to the admission of the confessions on the ground they were involuntary. No instructions were submitted and no exceptions were taken to those given. No testimony was offered by the defense touching on the merits, and in spite of the fact that defense counsel suggested undue influence

caused the accused to confess, the Government's evidence was to the contrary and no evidence was offered to refute this. Of necessity the objections were overruled. More important, however, and the most critical failure of all, was the lack of any attempt to avoid a death penalty. No other conviction appears against this accused, yet not one word was offered, sworn or unsworn, in extenuation or mitigation. The Government seeks to escape the effect of this failure by relying on the rule that where the defense fails to produce any evidence, we must presume the evidence would be adverse. While that presumption might be usable under certain circumstances, the posture of this record does not permit its adoption. This accused lived in the United States and the trial was held in Germany. He was given such a short time to prepare for trial that any investigation of his civilian record, his character, his environment, or even his military record was impossible. It was absolutely incredible to expect counsel to get possession of that evidence in the time allotted and the rule urged on us presupposes that some testimony, favorable or otherwise, is available. That it may not have been entirely adverse may be gleaned from the fact that a petition filed with the convening authority shows 122 citizens of his community had some interest in the boy's future and they might have shed some light on his past behavior had they been canvassed prior to trial. True, his battery commander rendered a report that his service was unsatisfactory, but thirty days before trial the accused had been promoted, and had time permitted inquiry, some members of his squad might have helped his cause. Again we know not what a proper investigation might disclose but we repeat, doing nothing is not evidence of skillful representation. When we fairly evaluate counsel's efforts from the four corners of the record, we wonder how any counsel could do less for his client.

The reason we have rebelled at the short time afforded defense counsel to contact possible sources of help on the sentence ought now to be apparent. In addition, the time necessary to inter-

view witnesses on the merits was not accorded him. The principal witnesses were German civilians and they must have resided some distance removed from headquarters. We sometimes believe that military authorities and defense counsel operate under a belief that it is improper for the defense to discuss the facts of a case with witnesses for the Government. If they would but take the time to read paragraph 42c of the Manual for Courts-Martial, United States, 1951, they would be convinced to the contrary. Further, as to a certain offense accused claims an alibi and it would require some time to determine the absence or presence of corroborating testimony. In referring to these illustrations, we are not suggesting they would necessarily bring about a different result. We are only intending to demonstrate why time is necessary to a counsel who is assigned the task of defending a serious offense.

We understand fully that defense counsel did not request a continuance to permit him properly to prepare his case but that only strengthens our belief that he was content to do too little. Taking a person's life, within the law, is fraught with serious responsibilities and certainly a defending counsel ought to appreciate that he, more than anyone, must not take his task lightly. It would be unfair in every sense of the word to hold against an accused the fact that his appointed counsel did not see fit to demand the time necessary to prepare properly for the trial. The attorney is the advisor and the accused must necessarily rely on him. When the record shows the former failed, we are not prone to let a death sentence stand.

There is only one bright spot in this entire record. That is found in the staff judge advocate's report and we quote therefrom:

". . . Considering, however, the accused's low IQ, the fact that no lasting physical harm was done to any of his victims, and the psychiatric report, along with the unnatural setting in which the accused has found himself, and the lack of evidence of any prior criminal tendencies, a recommendation should be made, in my opinion, that the sentence be commuted to life imprisonment. While the crimes of the accused cannot be minimized, they were not accompanied, in any of the three cases, with the unusual violence and terror which, in my opinion, warrant execution of the death penalty."

Those reasons, plus additional information obtained by deposition, if available, might have been given to the court-martial to consider when it was presented with the task of determining an appropriate sentence, but the short answer is they were not.

It should be obvious from what we have just stated that the failure of defense counsel to meet the minimal standards of representation in a capital case adds another deficiency to those previously mentioned.

## VIII

In the ordinary situation we would not give weight to the next matter we mention, but in the background of this record it becomes of importance. The convening authority saw fit to reject the recommendation of the staff judge advocate that clemency be extended and that a sentence to life imprisonment be affirmed. That was not error as he does not have the power to commute a death sentence, but in this instance he had endorsed on the staff judge advocate's report the following notation: "The action of the convening authority approving the death sentence without recommendation for commutation, was not taken through inadvertence." The attitude therein expressed reflects what is all too apparent from the entire record, namely, that from beginning to end this proceeding was primarily concerned with exacting retribution with the least possible delay. Stern measures and speedy trials are sometimes desirable, but neither should be used to snuff out a life if by so doing the right to a fair trial has been destroyed. Time is of the essence but not to the extent reflected by this record. We are more than satisfied that in this setting it was elevated over the rights of this accused to a just trial and sentence.

We have not overlooked the contention of the Government that counsel for accused waived many of the irregularities we have dealt with. Assuming arguendo that such is the case, waivers are seldom, if ever, relied on by appellate courts when a death sentence has been imposed. United States v. Cramer, 137 F2d 888, 895 (CA 2d Cir) (1943); Stephan v. United States, 133 F2d 87, 90 (CA 6th Cir) (1943). Particularly is that true when the record bespeaks inadequate representation. Furthermore, it is to be remembered that we are here concerned with both the findings and sentence, and a miscarriage of justice may be reflected in the latter. Here the findings are difficult to assail as the evidence points unerringly toward guilt but in the light of the sentence, we are certain that justice will be better served by requiring a new trial under conditions more consonant with the spirit of the Code.

Not because of any one error, but because of all, the decision of the board of review is reversed and a rehearing is granted.

BROSMAN, Judge (concurring):

On a few minor matters I find myself out of step with the author of the principal opinion—and I genuinely do not believe that the record reveals quite as dark a picture as he finds there. However, I am sure that these disagreements do not operate to prevent outright concurrence—for here I find an accumulation of deficiencies not only in the pretrial investigation, but in the trial itself. I am, therefore, in complete harmony with his conclusion that, in a capital case like the present one, these massed shortcomings compel the direction of a rehearing.

QUINN, Chief Judge (dissenting):

In United States v. Schuller, 5 US CMA 101, 17 CMR 101, the first case which directly stressed the importance of the pretrial proceedings in the military justice system, I wrote the opinion for the Court. Again in United States v. Allen, 5 USCMA 626, 18 CMR 250, in a separate concurring opinion, I said: "The pretrial investigation and the pre-

trial advice of the staff judge advocate are not mere formalities. They are substantial proceedings prescribed by the Uniform Code of Military Justice and they constitute the military equivalent of essential pretrial procedures which obtain in the civilian community." In United States v. Sippel, 4 US CMA 50, 15 CMR 50, the majority in summary fashion disposed of the Manual's requirement that the convening authority state his reasons for disagreement with the recommendations of his staff judge advocate. In my dissenting opinion in that case, I said:

"I further disagree with the majority in its casual treatment of the failure of the convening authority to state his reasons for taking action different from that recommended by his staff judge advocate. It seems to me that the Manual's requirement that the convening authority state his reasons in writing when he disagrees with the recommendations of his staff judge advocate, is an integral part of the effort to overcome arbitrary and capricious action by a commanding officer. True, the convening authority's failure to adhere to the provisions of the Manual may not be the kind of omission that will provide a basis for reversal by this Court, but we should not place our stamp of approval on his dereliction."

It is, therefore, unmistakably clear that I agree with the principles upon which the majority opinion rests. My disagreement is only with the application of those principles to the facts of this case.

The board of review considered the claim of prejudice on the part of the investigating officer. It found no "sound basis" for concluding that Captain Gamble was biased. I reach the same conclusion. The evidence shows that on January 27, 1954, Captain Gamble received a telephone call from Criminal Investigation Detachment agents and was asked to bring the accused to their office for questioning. At the time, Captain Gamble was serving as "serious incident investigating officer of the organization." There are some indications that he had talked to the accused

about the offenses before that date. The nature and the circumstances of these conversations are not shown in the record. However, it clearly appears from the accused's statement in his petition for a new trial that Captain Gamble did not seek to fix upon him responsibility for the offenses. According to the accused, Captain Gamble never questioned him about the offenses.

The day after the accused's apprehension, his battalion commander, company commander, and Captain Gamble, called at the military police station where he was confined. The battalion commander asked him if he had committed the offenses, and he replied that he had not. They then procured his release from custody, and took him back to the kaserne. There, he was not even restricted. Instead, he was permitted to attend school as "he had been doing." Captain Gamble merely told him to keep together the clothing that he had been wearing on the night of the alleged offenses.

On January 27, the Captain called him from school and told him that the Criminal Investigation Detachment agents wanted to see him. The Captain drove him to the Criminal Investigation Detachment office and "was present during [an] interrogation by the agents." In the course of the interrogation, the accused asked to speak privately with the Captain. His request was granted. In the private conversation that followed, the accused asked Captain Gamble if the matter could be kept from his mother and wife; his mother had a weak heart and he did not "know how she would take it." The Captain assured him that the "Army would do all it could," to keep them from "knowing about this." The accused then told the Captain that he would give the agents a statement but he "didn't think this was rape."

After the accused's statement to the Criminal Investigation Detachment agents, one of them took out a "file of unsolved cases" and questioned the accused about them. The accused denied knowledge of them but offered to point out places where he had had paid affairs with women. He, Captain Gamble, and a Criminal Investigation Detachment

agent, went to "various places" indicated by the accused. On returning to the Criminal Investigation Detachment office, the agents continued to question the accused in Captain Gamble's presence. At the trial, Captain Gamble unequivocally denied that he had in his private conversation with the accused, said: "Parker, if you were a member of a general court-martial and somebody came in with a confession, the accused told the truth, would you . . . let him off light?" He also said that immediately after the Criminal Investigation Detachment agents had finished interrogating the accused, he took him back to the kaserne.

There is nothing in the foregoing evidence which even remotely indicates that Captain Gamble "importuned Parker to confess" or that he had "convinced the accused of the desirability of making a full confession," or that he had "obtained the clinching evidence" against him. It seems plain to me that the accused was willing to talk but that first he wanted Captain Gamble's opinion on a collateral matter. I find it very significant that nowhere in his petition for new trial does the accused himself assert that Captain Gamble was prejudiced against him.

The majority attach great importance to Captain Gamble's pretrial statement which he appended to his report as investigating officer. This, the majority say, is evidence that Captain Gamble was "used as the chief architect to outline" the case against the accused and it demonstrates his biased attitude. I read no such sinister implication into this statement. The statement is only an account of the accused's pretrial statement to the Criminal Investigation Detachment agents which was made in Captain Gamble's presence. It seems to me, therefore, that the situation is substantially the same in principle as that in United States v. Taylor, 5 USCMA 523, 18 CMR 147.

In the Taylor case, the convening authority authenticated a morning report entry showing an unauthorized absence by the accused. This entry was admitted in evidence at the trial and it was uncontradicted. Later, the convening

authority reviewed the record of trial. We held that even though the convening authority had in effect appeared as a witness against the accused at the trial, he was competent to review the conviction. We indicated that the convening authority's previous action in connection with the offenses was entirely official and showed no personal interest in the outcome of the case. See United States v. McClenny, 5 USCMA 507, 18 CMR 131. Here, Captain Gamble was the "serious incident investigating officer" for the accused's organization. He was specifically requested by Criminal Investigation Detachment agents to bring the accused to their office. He did so. While there, the accused asked his advice about the possibility of keeping the knowledge of his involvement in the offenses from his family. Then the accused made oral statements to the agents in Captain Gamble's presence. Later Captain Gamble took the accused back to the kaserne. Accordingly, it seems to me that whatever Captain Gamble's role was in the preliminary proceedings against the accused, it was not that of a detective intent on procuring evidence against him. There is nothing in his position which indicates a desire to press the charges to trial as an "accolade for his efforts," in securing evidence against the accused. See United States v. Coulter, 3 USCMA 657, 14 CMR 75, page 660. Consequently, there is no basis except that of pure speculation upon which to say that Captain Gamble was prejudiced and unfair in his conduct as the pretrial investigating officer.

Looking at the investigation report itself, the majority find a number of sinister implications. Thus, it points out that the appropriate blank space was not checked to show whether the accused was advised that any statement made by him might be used as evidence in a trial by court-martial. The failure to fill in the blank on the warning may have been inadvertent, but even assuming that no warning was given, I draw no evil inference from the omission. The fact is, that the accused was informed "of his right to make a statement or remain silent," and he made no statement. Therefore, the accused was

not harmed. But, since the question is not one of actual harm but of evil design, I have scrutinized the circumstances and I conclude that they show no such purpose.

The day before the accused was interviewed on the pretrial investigation, Captain Gamble was present when the accused was advised of his rights under Article 31, and he said that he understood them. Also, the Captain himself had advised the accused of his rights under the Article. It may be, therefore, that Captain Gamble honestly believed that it was unnecessary to repeat the provisions. Certainly, if he did not warn the accused, he was honest enough to reflect the omission in his report. If he was, as the majority say, a master mind "of the detective crew," it seems incredible that he should be so stupid as to overlook a matter which is routine with military law enforcement agents. Moreover, if he and the convening authority were, as the majority find, intent on going through only the motions of a pretrial investigation, surely they would have made special efforts to insure that at least the form was unimpeachable.

As a "definite clue" to the pernicious significance of Captain Gamble's failure to check the appropriate blank on his report, the majority point to his statement that "Subject accused admitted to offenses as charged." What is wrong with that? The statement was made in the remarks section and it is not set out as an incriminating admission by the accused during the investigation. There is, therefore, nothing inconsistent between the refusal of the accused to make a statement to the investigating officer and the references to his pretrial admissions to the Criminal Investigation Detachment agents. The latter were made in Captain Gamble's presence. It was surely proper for him to note them on the report. Suppose he knew of facts which were beneficial to the accused. Should he refuse to disclose the information in his report? I think not. If it is proper to mention the facts in the one instance, surely it can be done in the other. Of course, the previously acquired knowledge may indicate a personal interest in the out-

90

come on the part of the investigating officer. If that statement shows that he was biased he should be removed, and a new investigating officer appointed. In the statement submitted here, I find no evidence of a biased attitude against the accused.

The second prop supporting the principal opinion is the period of time between the referral of charges to trial and the trial itself. It is said that the preparation of the defense in a case of this kind "If done properly . . . is time consuming." Ordinarily that is correct. The issue, however, is not the length but the adequacy of the preparation. And the specific question is whether the accused was deprived of a fair trial by the necessity of defending himself without adequate preparation. The majority say that the convening authority, "In total disregard of a reasonable time factor . . . ordered the case to be tried within twenty-four hours of the time the order was published."

The majority's argument disregards two facts which are important. First, the charges were originally referred for trial on January 29, 1954, and were served upon the accused on January 30, 1954. Captain Fenig was the defense counsel of that court. Presumably, he undertook preparation for the defense at the time the accused was served with the charges. Manual for Courts-Martial, United States, 1951, paragraph 6a, page 10; United States v. Hightower, 5 USCMA 385, 18 CMR 9. Common sense indicates that he would turn over the results of his work to his successor, Captain Silverberg. Second, in his petition for a new trial, the accused concedes that he was interviewed by Captain Silverberg at least three days before the trial, which took place on February 9. It would affirmatively appear, therefore, that the accused had ample time in which to prepare his defense. Moreover, the impression created by the majority is that the date of trial was fixed peremptorily against the accused. Actually, the order is in the normal form. It provided for convening the court-martial at "0900 hours, 9 February 1954, as as soon thereafter as practicable." There is nothing in this language which indicates that the accused would have been denied a continuance if he had applied for one. No continuance was requested, and there is nothing in the record of trial, or in the accused's petition for new trial, which even intimates that a continuance for further preparation was necessary or desirable.

The third main reason which the majority rely upon is an assumed lack of competency on the part of military counsel who represented the accused at the trial. Again, I fully agree with the general principles set out by the majority as to how an accused's claim of a lack of competent counsel should be met by the Government. However, I am not persuaded by their speculations to find that defense counsel here was incompetent. Other counsel may have conducted a more dramatic cross-examination or made a more polished final argument, but no one could argue effectively against the telling force of the facts. Perhaps the principal deficiency of defense counsel was his failure to present evidence in mitigation. Even here, however, there was an element of great risk which must be recognized. The accused is a married man with two children. He was the father of one of the children before he was married. He was overseas less than six months when he contracted a venereal disease, and it was less than six months after his arrival that he committed the first offense. These facts are not likely to engender sympathy for the accused. It is not unreasonable, therefore, to conclude that the accused and his counsel decided advisedly to make no statement and to take a chance on the sentence.

A number of other points are raised by the majority. However, I have said enough in reply. I have a feeling that the majority is disturbed by the death sentence. They would like to have it reduced but they are unable to accomplish that purpose short of a rehearing. See United States v. Goodwin, 5 US CMA 647, 18 CMR 271; United States v. Freeman, 4 USCMA 76, 15 CMR 76. I have no difficulty. See my dissent in United States v. Goodwin, supra. If

the majority voted to return the case to the board of review for reconsideration of an appropriate sentence, I would join them. On this record, however, I cannot concur in ordering a rehearing. I would therefore deny the petition for a new trial and affirm the decision of the board of review.