UNITED STATES, Appellee

v.

RAYMOND D. WALKER, Airman Second Class,
U. S. Air Force, Appellant

3 USCMA 355, 12 CMR 111

No. 2649

Decided September 11, 1953

 
██ 

Col Kenneth B. Chase, USAF, and Capt Daniel O'Leary, USAF, for Appellant.

Lt Col Harold Anderson, USAF, and Capt Giles J. McCarthy, USAF, for Appellee.

## Opinion of the Court

Robert E. Quinn, Chief Judge:

This case is before the Court on the accused's petition for review.

Tried for premeditated murder, the accused was found guilty of unpremeditated murder, in violation of Article 118, Uniform Code of Military Justice, 50 USC § 712, by a general court-martial in Korea on June 17, 1952. He was sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for ten years, and the sentence was approved by the convening authority. An Air Force board of review, with one member dissenting, approved only so much of the finding of guilty as found the accused guilty of involuntary manslaughter, in violation of Article 119 (b), Uniform Code of Military Justice, 50 USC § 713. It approved the sentence but reduced the period of confinement to two years. The dissenting member of the board voted to dismiss the proceedings because he believed that the evidence not only failed to support a conviction for the offense charged, but was also insufficient to establish guilt of any of the lesser included offenses.

At the trial the defendant was represented by individual counsel, a member of the Massachusetts bar, but not certified in accordance with Article 27(b), Uniform Code of Military Justice, 50 USC § 591, and the appointed defense

356

counsel, who was retained in the case to assist. The defense case was conducted almost exclusively by individual counsel, but at the close of the case the appointed defense counsel asked for and was given permission to make a statement. This statement will be set out at length later in this opinion.

On the afternoon of April 9, 1952, Corporal Mack Satcher, the deceased, engaged in heavy drinking with a fellow soldier. In the early evening, he and his companion went to a village located near their anti-aircraft gun positions at the K-6 Airbase in Korea. At the edge of the village, they met some Korean girls to whom they talked. Satcher "kind of pat[ted] them around." After this relatively harmless beginning Satcher pursued a course of conduct which ranged from assault and battery upon an uncounted number of Korean girls to several probable assaults with a dangerous weapon. According to the prosecution witnesses, he beat a number of Korean women; at the point of a carbine he compelled an Airman French to drink native whiskey; he pointed a loaded carbine at the accused and Airman Ford when they sought to protest his beating of a Korean girl, and he kept them backed up against the outside wall of a house for a period of five to ten minutes. We omit the details of these and other epi-

sodes of Satcher's drunken belligerency to pass to the events following his assault upon Ford and the accused.

After the assault upon them, Ford and the accused went to a nearby Korean house. There Ford asked an unidentified airman for a pistol. He was given a .45 calibre pistol, but the accused took it from him. The accused removed the clip, checked the weapon, put on the safety, and placed the gun in his belt under his shirt. Both of them then proceeded to a different house in the area to inquire about a girl with whom the accused was to spend the night. At the house the mamasan informed them that the girl had gone elsewhere. The accused left to find the girl. While on his way, the accused saw Satcher. Satcher was waving his carbine around, and, according to one of the prosecution witnesses, he was talking "pretty rough" to a Korean girl. The accused approached him.

Three witnesses, all of whom were within six to ten feet of Satcher testified to what happened when the accused approached. So, too, did the accused. Although there are some differences, the substance of their testimony is the same. The acccused came up to Satcher with the pistol in his right hand. Parenthetically, we note that some of the testimony showed the gun to be in the accused's left hand, but the board of review- found the former to be the fact (page 15). The accused told Satcher to give him the carbine; he then reached out and seized the gun. In the next three seconds, the accused said to Satcher, "walk in front of me," and then a shot sounded. Satcher took two or three steps and fell. The accused ran away. As he ran from the scene of the shooting, the accused met Ford. Ford asked him what happened, and the accused replied that he had accidentally shot someone. Ford took the pistol from the accused, and returned it to its owner. Both of them started back for the Airbase. On the way, across the rice paddies between the village and the base, they stopped to wipe off the fingerprints from the carbine and then they threw the gun away. A short time after arriving at the base they were taken into custody by the Air Police.

In his opening statement at the start of the defense case, individual defense counsel admitted the shooting. However, he strongly contended that accused was lawfully trying to disarm Satcher to return him to the base and that the shooting which occurred in the course of this act was an unfortunate accident. The accused took the stand on his own behalf. He testified that when he left the Korean house to look for the girl, he saw Satcher standing around with his carbine pointed at various people, and that Satcher was saying vulgar things. Intending to take him back to the compound and end the disturbances, he walked up to Satcher to disarm him. With the pistol in his right hand, but with the safety on and his forefinger off the trigger, he approached Satcher from the front. As he came up, he seized Satcher's carbine with his left hand. He told Satcher to turn around and as he did so the carbine went off. After the shot, he ran away because he was frightened.

The accused could not give any reason for the discharge of the carbine, except to say, in response to a question by the court, that "I suppose by lifting it, sir." After he had taken the weapon from Satcher, he held it down on his left side at arm's length, but he pulled it up when he heard someone say "what's going on." At that instant the carbine went off. He admitted that his fingers were around the trigger guard of the carbine and that it was "possible" that one finger was on the trigger.

When both sides had rested, individual defense counsel renewed his motion for a finding of not guilty and the motion was denied. Individual counsel then made a lengthy closing argument to the court in which he reviewed the evidence and went through each of the possible findings of guilty to point out that none could apply to the facts of the case. Trial counsel followed with his own closing argument. At that point, the appointed defense counsel requested permission to make a statement. Since it is important to the decision, we set out the proceedings in full:

**357**

"DC: I would like to request the court's permission just to say a few brief words.

"LO: I am going to permit it. Normally defense counsel has one closing argument. Go ahead.

### CLOSING ARGUMENT OF THE DEFENSE COUNSEL

"DC: Gentlemen, I have had the privilege of being with you now for a day and a half. I came here as a stranger from another base, and I want to tell you that I have enjoyed meeting all of you, and that I have enjoyed being present and participating in this trial with you.

"For the past several minutes listening to the argument of my co-counsel, Major Keefe, and the trial Counsel, Captain Kinevan, I have been thinking to myself, now, what would I do if I were sitting as a member of that court? This man is charged with premeditated murder. That's a horrible offense. On the other hand, a man has been killed. We can't have that sort of thing going on. I believe that there is not a single one of you court members that believes that the accused is guilty as he is charged. I don't believe that there is a single one of you who thinks that he actually intended to commit this crime. So what option do you have between finding the accused guilty as he is charged or acquitting him? I am sure that you are not going to find him guilty as charged, and I know that some of you, in your own minds, are not satisfied that he should be acquitted because that, to your way of thinking, is condoning an offense.

"I would like to read a small portion of the only case that I have been able to find of the four court-martial manuals now published by the Air Force, which is similar to the case in hearing. This is the case of the U. S. v. Corporal Joe M. Ramirez, and is published in Volume I of the Court-Martial Reports, Air Force, beginning on page 154. In that case the accused was charged with the wrongful killing of a military policeman by shooting him with a pistol. He plead-ed not guilty to the offense. The court found him guilty, but after finding him guilty, recommended to the reviewing authority that the entire sentence which they had imposed be remitted. I call that to your attention, gentlemen, because you are in a position to recommend clemency if you feel it is deserving.

"Thank you.

"IC: Let's not kid ourselves, gentlemen. Based on the evidence adduced by the prosecution, you can certainly come to a conclusion of not guilty.

"LO: Has the prosecution anything further to offer?"

Three errors for reversal are urged:

(1) That the evidence is insufficient to support the findings;

(2) That the law officer committed prejudicial error in failing to instruct on excusable homicide; and

(3) That the accused was deprived of the effective assistance of counsel by the closing statement of the appointed defense counsel.

The same errors were urged upon the board of review. As previously noted, the board reduced the findings of guilty of unpremeditated murder to involuntary manslaughter, but one member dissented on the ground that the evidence did not support a finding of guilty of that offense or any lesser included offense. The board's finding in this connection is stated in the majority's opinion as follows:

". . . The board is not convinced beyond a reasonable doubt that the accused pulled the trigger of the carbine intentionally or that he intended to kill or injure the decedent. The reasonable doubt on this point is introduced by the uncontroverted evidence that accused told the deceased to turn around, and by the accused's not illogical explanation that he intended only to take the deceased back to his organization. There is also the circumstance that the accused did not fire the pistol with which he had previously armed himself and with which he approached the deceased. . . ."

We are asked to set aside the decision of the board of review and order the charges dismissed on the ground that there is insufficient evidence to support a finding of guilt of any offense. Based upon the acceptance by the board of review of the accused's purpose in approaching Satcher, there may be color to this contention. See United States v. Quisenberry, 1 USCMA 670, 5 CMR 98, decided September 9, 1952. But in view of the action which we take with respect to another of the assigned errors, we do not consider it necessary to decide the issue. See United States v. George C. Berry, 1 USCMA 235, 2 CMR 141, decided March 18, 1952.

We turn to the claim that the accused was deprived of the effective assistance of counsel. We have had a ▆▆▆▆▆ ■ like claim presented to us in other cases, and in each we found that the accused did not have just cause for complaint. United States v. Hunter, 2 USCMA 37, 6 CMR 37, decided October 17, 1952; United States v. Soukup, 2 USCMA 141, 7 CMR 17, decided January 23, 1953; United States v. Bigger, 2 USCMA 297, 8 CMR 97, decided March 9, 1953. However, in none of those cases did we foreclose our right to reverse a finding of guilty because of incompetent representation by defense counsel. Thus, in the Hunter case *supra,* we said:

"After appointment of counsel, as required by the Code, an accused, if he contends his rights have not been fully protected, must reasonably show that the proceedings by which he was convicted were so erroneous as to constitute a ridiculous and empty gesture, or were so tainted with negligence or wrongful motives on the part of his counsel as to manifest a complete absence of judicial character. See Diggs v. Welch, 148 F2d 667 (CA DC Cir). . . ."

We think that the conduct of the appointed defense counsel here was, at the very least, so grossly negligent as to come within the exceptional situation recognized in the Hunter case.

Individual defense counsel's efforts in the cross-examination of the prosecution witnesses, his statement on the opening of the defense case, the testimony of the accused himself, the motions for a directed verdict, and individual counsel's closing argument to the court, were all directed to a single purpose, namely, to establish that the shooting was an accident. If the accused could convince the court that the homicide was excusable because of an accident, he would necessarily go free. Manual for Courts-Martial, United States, 1951, paragraph 197c. However, the whole fabric of the defense was demolished by the "few brief words" of the appointed defense counsel. The claim of accident was ground into powder by the statement of the appointed defense counsel. In it, he invited the court to convict the accused of "wrongful killing" but to recommend clemency if they felt it was deserving.

We know of no case quite like this. Of course, the obvious and simple explanation is that when an accused pleads not guilty and his chief counsel presents a vigorous defense, associate defense counsel in a closing argument which he is not expected to make, should not destroy his efforts by a confession of guilt. Such conduct is almost incomprehensible, but it happened here. And we cannot escape the conclusion that it substantially prejudiced the accused.

There are a few Federal cases in which defense counsel, in his closing argument, admitted the guilt of the accused, and the admission was held tantamount to a plea of guilty which was binding upon the accused on appeal. United States v. Moe Liss, 105 F2d 144 (CA2d Cir) (1939); Dick v. United States, 40 F2d 609 (CA8th Cir) (1930). Without deciding whether the principle upon which these cases rest is applicable to courts-martial practice, it appears in each of those cases that the admission was part of trial tactics and the accused consented to it. In the absence of a clear showing that the accused acquiesced in the argument of his counsel, an admission of guilt in the closing argument, after a contested case, is reversible error. Tatum v. United States, 190 F2d 612 (CA DC Cir) (1951).

In the Tatum case the accused was tried for rape. The defense was in-

sanity. However, defense counsel thought that, although "abnormal," the accused was legally sane. He also believed that the prosecution had a strong case. Consequently, in his closing argument to the jury, which jury had the right to impose the death sentence when it reached a verdict, the defense counsel conceded that a verdict of guilty would be proper, but urged that the death penalty should not be imposed in view of the accused's abnormality. The accused was found guilty. In reversing the conviction, the Court of Appeals for the District of Columbia said (page 618): ·

> ". . . . counsel selected the course we have described. Even so, we think he went too far. His client had not conceded guilt. On the contrary, as we have seen, an issue of mental capacity had been raised. When counsel conceded to the jury that a verdict of guilty was proper, he conceded away that defense. Thus, by action of court-appointed counsel, appellant was deprived of the judgment of the jury upon the defense he had advanced and also upon the credibility of the prosecution's case. We think that in the circumstances of this case the action of counsel was a defect 'affecting substantial rights.' We are not, of course, implying any general restriction upon concessions by counsel, some of which are not only proper but highly commendable."

The concession of guilt by the appointed defense counsel was totally divorced from the defense tactics of individual counsel, and the time and the circumstances under which it was made indicate that it was not acquiesced in by individual counsel, or by the accused. Had there been previous agreement between appointed and individual defense counsel on the statement, as suggested by the Government, there would have been no need for individual counsel to say anything after it was made. The fact that he made a further hasty comment signifies surprise and dismay at his associate's concession of guilt. This reaction is made clear by reference to the proceedings just before the statement. Although he granted the appointed defense counsel's request to speak, the law officer pointed out that the defense was entitled to but one closing argument. Despite this reminder, immediately after appointed defense counsel had concluded his statement, individual counsel rose to say that the court could "certainly" acquit the accused. It was unquestionably an attempt to reestablish the structure of the defense; but, unfortunately, the foundation was gone. This open conflict between individual counsel and appointed defense counsel as to what verdict the court should return seriously lessened the force of the defense of excusable homicide, and substantially injured the defendant in his right to a fair trial. See Cornwell v. State, 106 Ohio St 626, 140 NE 363 (1922).

The Government contends that the concession of guilt should be ignored because the court receives its guidance from the law officer and not from the defense counsel. As a matter of law that proposition is incontrovertible; but, applied to this case, it emphasizes the effect of the error rather than minimizing it. The law officer might have been able to correct the error by instructing the court on accident as a defense to the homicide. But, he did not do so. We do not decide, as urged by appellate defense counsel, that he is obliged to give such instruction in every case where excusable homicide is raised as a defense, but we point to the omission to highlight the effect of appointed defense counsel's concession of guilt. With only *pro forma* instructions on the elements of the principal and lesser included offenses, including that of voluntary manslaughter, which had no basis in fact, and no mention of accident as a defense, the court might have reasonably concluded that the claim of accident was no longer in issue. We can imagine a progression of reasoning by the court as follows: "the accused claimed that the shooting was accidental, but his appointed defense counsel has now conceded his guilt; the law officer has said nothing about accident as an excuse to the homicide; why then should we consider it?" In any event, the concession of guilt may have removed that defense from consideration by the court;

and we need not speculate as to whether it did so in fact. As we said in United States v. Yerger, 1 USCMA 288, 3 CMR 22, decided April 7, 1952:

". . . . If error occurs which could reasonably have had an effect upon the court's findings, the accused is not required to prove, through exploration of the members' mental processes, that it did in fact influence them. Little v. United States, 73 F2d 861, 866 (CA10th Cir). . . ."

For the above reasons, the decision of the board of review is reversed and a rehearing is ordered. The record is returned to The Judge Advocate General of the Air Force for action consistent with this opinion.

Judges LATIMER and BROSMAN concur.