UNITED STATES, Appellee

v.

MICHAEL C. LOWRY, Private First Class, U. S. Marine Corps,
Appellant

4 USCMA 448, 16 CMR 22

No. 3888

Decided June 25, 1954

Francis C. Foley, Jr., Esq., and CDR John T. Davies, USN, for Appellant.
LCDR H. D. Golds, USNR, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Between 2:45 a.m. and 3:00 a.m. on March 21, 1952, two women marines were beaten while asleep in their barracks at the El Toro, California, Air Station. One of them suffered a blow on the head which caused considerable swelling and ·bleeding. The other incurred a compound fracture of the frontal bone which perforated the ear drum and paralyzed a facial nerve. The accused was tried and convicted for these offenses which were alleged as violations of Articles 124 and 128, respectively, 50 USC §§ 718 and 722, and of housebreaking. He was sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for ten years. The conviction and sentence were affirmed by a board of review, and a motion for reconsideration was denied. We granted review to consider the sufficiency of the evidence and the correctness of certain actions taken by the law officer.

The accused was apprehended as he sought to run out of the front door of the women's barracks. He  was immediately taken to the station brig where he was warned of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602. He made a number of oral incriminating statements. In the evening of March 21 and on the morning of March 28, he dictated statements to the agents of the Office of Naval Intelligence, which were reduced to writing and signed by him. Before each of these statements, the accused was again warned of his rights under Article 31, and expressly told that he could have an attorney if he wanted one. No request for counsel was made

**449**

on either occasion. The first statement is a partial admission of guilt. The second is a complete confession; it is too long to set out in full, but, in pertinent part, it reads as follows:

"On the morning of 21 Mar 1952, at about 0200, when I left my barracks at the Marine Corps Air Station, El Toro, and was heading towards the main gate, I was thinking about my girl and then got a disappointed attitude about all women. Instead of going off the station I went to the Air Fleet Marine Force Post Office on the station and took a nozzle from the hose, which is just in the hallway as you enter the building. . . . I then went to the door of the Women Marine barracks just across the street from my own barracks and found that the door was unlocked. I was continually thinking about my girl and just wanted to hurt a woman to relieve this feeling I had about my girl. After entering the office I went to an inner double door, on the left side of the office, and partially opened the door. I couldn't get it all the way open because it had a padlock on the other side, so I pulled on the door and broke it open. From there I went into the first wing on the left side. I believe this is Wing 6. I entered the Wing and went down to the third or fourth bunk on the right side and hit the girl who was sleeping in the bottom bunk on the head with the nozzle. I hit her about twice and then she screamed. Her head was toward the aisle and I believe I hit her on the left side of her head. When she screamed I ran down the aisle in the opposite direction from where I entered, and then out the fire door into the parking lot. I cant exactly remember which way I was running, but I know I reentered the building and went up the stairway close to the double doors that I forced open when I entered the first time. I looked in several doors in the hallway upstairs and then entered one of the wings on the same side of the building closest to my barracks. It was in this wing that I hit the girl on the head which I mentioned in my previous statement.

. . . I ran out of the wing, down the same stairs I had come up, and into Wing 5. I ran through the wing and tried to get out by the fire door at the far end of the wing. When I banged up against it it didn't open. When the door wouldn't open I began to be afraid that I would get caught. I still had the hose nozzle with me at this time. . . . I walked back three or four bunks, got a piece of cloth off one of the bunks which was empty, and wiped off the nozzle, thinking there might be some of my fingerprints on it. I then laid the nozzle on the floor with the cloth. I don't know why I did it, but I stopped at a bunk close to where I had laid the nozzle, and started unbuttoning the pajama tops of the girl in the bunk. As I was doing this the girl raised up and said 'What are you doing here?'. I didn't answer her, but just ran out of the wing the same way I had entered it. I continued running down a short hallway, then turned right down a long hallway toward the front of the building. I ran through the swinging doors into the Recreation Room where I hit up against a pool table. I ran around the table, and out the front door. Just after I got down the front steps the guards stopped me.

* * * * * *

I have read the above statement which consists of this and two other typed written pages and have initialed all corrections and the bottoms of pages one and two. This is true and correct to the best of my knowledge.

/s/ Michael C. Lowry"

Constituting part of the prosecution's case is the testimony of a Sergeant Carol McLeod, one of the occupants of Wing VI in the women's barracks. She testified that, shortly after she came off security watch, she went to bed; she had not yet fallen asleep when she heard an outcry from the middle of the bay. She then heard someone running. Turning toward the direction of the sound, she saw a man near the fire exit. He was illuminated in the light of the electric bulb over the door. Sergeant McLeod was "certain" that

the man she saw then was the same one she saw later that evening who ran through the lounge and was captured as he went out of the front door.

The prosecution also established by expert testimony that a fragment palm print taken from the inside of the door of Wing VII, located on the upper floor of the barracks, was the same as a print taken directly from the accused. It was also shown that, on comparison, a positive photograph of the heel of the accused's left shoe gave "a good impression of similarity" with a footprint in the earth near the front entrance of the barracks. A fire hose nozzle bearing traces of blood was found on the floor of Wing V; it was wrapped in a girl's housecoat.

The accused testified on his own behalf. His direct testimony was essentially limited to a statement that he did not "remember hitting any girls," and that, while he had read and signed the statements of March 21 and 28, he did so only because he was "convinced . . . through suggestion" of the Naval Intelligence agents that he had committed the acts. On cross-examination he said that, on leaving his own barracks which was located across the street from that of the women's barracks, he heard a scream. He ran to the Post Office, down the street, and obtained a nozzle from the fire hose to "defend himself"; he then returned to the women's barracks and entered through the rear door which was open. He looked into, but did not enter, any of the wings on the ground floor. Then he went upstairs. There he saw a shadow; he started after it down the stairs, and "the next thing . . . [he] knew, . . . [he] hit the pool table." He was apprehended as he went out of the front door of the barracks. He "blacked out" when he was being taken to the brig, and did not remember making any of the oral admissions attributed to him. Questioned closely about the written statements, he admitted that much of it was true, but that it was all "suggested" to him. In the accused's own words, "They just said that maybe I did it this way, and they'd ask me is that right, and I'd say I guess so, I don't know."

In addition to his own testimony, the accused called two of the women marines who had seen a man in the barracks during the period in issue. Each stated that the accused was not the person whom she had seen, and each identified a Private Broughten as the intruder. However, the morning after the incident, one of these two girls had attended a line-up which included the accused and Broughten and had been unable to identify the man whom she had seen in the barracks. Broughten was called as a witness by the prosecution. He denied that he had been in the women's barracks on the night of these events.

Undeniably, someone broke into the women's barracks and committed the offenses charged. Implication of the accused as the guilty person appears from Sergeant McLeod's identification, the expert comparison of palm and footprints, the discovery of a fire hose nozzle with traces of blood on it on the floor of the barracks, and, most important and direct, the accused's own oral and written statements of guilt. To counteract this prosecution evidence, there is the testimony by two of the occupants of the barracks, one of whom was an assault victim, that it was Broughten and not the accused who was the culprit. In addition, there is the accused's testimony that his written confessions were the result of "suggestions" made to him and that they were not true.

The testimony on both sides has certain inconsistencies and contradictions. However, we need not refer to these. The summary of the evidence is sufficient to make it clear that the guilt or innocence of the accused depended on the weight of the uncontradicted facts and credibility of the witnesses, including the accused. This Court can neither reweigh the evidence nor redetermine the credibility of the witnesses. We are satisfied that the record contains substantial evidence to support the findings of guilty. United States v. Armstrong, 4 USCMA 248, 15 CMR 248.

In his second assignment of error, the

accused contends that the law officer committed prejudicial error  by submitting to the court citations of decided cases. It appears that in the course of his instructions, the law officer read certain pages from the Manual. He followed this practice when delineating the elements of maiming in violation of Article 124, Uniform Code of Military Justice, supra (the first offense charged) and the lesser included offenses of aggravated assault, and assault and battery. After instructing on these elements, he made this remark, "I will give you the citations for all this for your own information when I finish." He then instructed on the elements of assault with a dangerous weapon (the second charge), and referred the court to his discussion of the "different types of assaults" under Charge I. He continued his instruction with a statement of the elements of housebreaking, and concluded with the standard instructions on the presumption of innocence and the burden of proof.

After the instructions, the court closed for deliberation on the findings. Twenty-three minutes later it reopened and the following colloquy ensued:

"PRES: The court would like to request counsel to register any objections to the following procedure if they have any. The members feel that they would like a considerable length of time to deliberate upon this matter because they consider it a very very serious thing for the accused. Consequently to use a common term, they would like to sleep on the matter. We will remain in deliberation here if counsel or either counsel desires until we resolve the issue. Even if we have to stay here all nightlong, if counsel desires, but we would like counsel to agree that the court may now be recessed so that the individual members can deliberate, think over what they have heard and consult the Manuals, and the citations quoted by the law officer. So that there is no question but what they have considered the matter frim [sic] every angle. We would like to recess until tomorrow morning at 9 o'clock

in the morning unless we hear an objection from counsel, or the law officer.

TC: The trial counsel has no objection.
DC: No objection.
LO: The law officer sees no objections."

On reconvening the following morning, the court immediately went into closed session. Thirteen minutes later it reopened and the president announced a verdict of guilty on all charges.

The record does not show what citations were given to the court. The accused has submitted an affidavit from one of the members of the court which recites that "Following the instructions given by the Law Officer, . . . a number of cases of law were cited by name and number. At that time I noted the first two or three of these citations on some scrap paper. However, I did not note them all. I am unable to recall these instructions at this date." From the affidavit it would seem that one member of the court did not pay much attention to the citations; but from the president's statement, it appears that the court actually attached considerable importance to them, and that they desired to consult them in their individual deliberations on the guilt or innocence of the accused.

Aside from the unorthodox nature of a proceeding which permits court members to deliberate on the findings in the privacy of their own homes or in that of a law library, we have "repeatedly condemned" the practice of law officers referring the court to "outside sources" for the elements of the offenses charged. United States v. Chaput, 2 USCMA 127, 7 CMR 3. True, the law officer did not simply limit his instructions to references to such sources, but actually read the elements as they appeared in the text of the Manual for Courts-Martial. However, he did not stop there. Apparently to support his instructions, he provided the court with a list of cases. The record is silent on when and how the cases were given to the court, and what the citations were. From the law officer's remarks and the affidavit of the court

member, it would seem that they were dictated orally and related to the offenses of maiming and the lesser included offenses of aggravated and simple assault. But, this information does not solve our problem. The cases plainly were intended as part of the instructions. A record which does not contain all of the instructions is clearly deficient in a vital part. United States v. Whitman, 3 USCMA 179, 11 CMR 179.

Incompleteness of a record may result only in setting aside a punitive discharge. See United States v. Whitman, supra. However, the deficiency here was much more serious. If a trial judge refers to decided cases as a part of his instructions to the jury, prejudicial error does not necessarily arise, Notary v. United States, 16 F2d 434 (CA 8th Cir 1926); but if the cases cause confusion, or if the jury is permitted to use them for the purpose of determining for themselves what law should be applied to the case, then prejudice is present. United States v. Chaput, supra.

Since we do not know what citations were given to the court, we are unable to determine whether or not they confused the instructions. The Government argues that inasmuch as the law officer was duly certified as qualified to perform that duty, it must be assumed that he had sufficient intelligence to provide cases which did not conflict with his own instructions. For the purposes of this case, we are quite willing to make the assumption, but that does not resolve the issue.

The court members were undeniably provided by the law officer with case citations. The law officer impressed upon them it was for their "own information," and the president of the court clearly indicated the members desired to read the cases. The record does not show when or how they were given to the court; neither does it show that defense counsel objected. From a transcript of an out-of-court hearing, appended to the record as an appellate exhibit, it appears that the law officer conferred with counsel regarding the instructions. However, the law officer's own instructions are not recorded. It seems that they were only submitted to counsel "and passed." Therefore, we have no way of determining whether the case reference was part of the "passed" instructions. For all that we can determine from the record, defense counsel may have been entirely unaware of the reference; or, if it was part of the open court instruction, he may have objected to it.

If the accused objected to the submission of the cases to the court, he should, of course, be entitled to have an appellate tribunal pass on the legal correctness of the contents of those cases in relation to the facts of this case. See: United States v. Chaput, supra. Here, he is deprived of that substantial right by the deficiencies in the record. On the other hand, if the accused was unaware of the reference, the submission of the cases would be tantamount to a private communication between the law officer and the court. A communication of that nature is presumed to be prejudicial. United States v. Adamiak, 4 USCMA 412, 15 CMR 412. The presumption may be overcome by a "clear and positive showing" that the improper communication did not, in any way, influence the decision. However, there is no indication of this. Not one of the cases has been made known to us. It may well be that the facts recited in them had considerable influence upon the court. But, we are not required to speculate. The presumption of improper influence has not been overcome. Cf. United States v. Walker, 3 USCMA 355, 12 CMR 111.

It has been urged that the accused waived his right to the claim of error by failing to object to the court's request for a recess. We do not agree. The circumstances are altogether too equivocal to spell out a waiver. We have already pointed out that, as far as it appears from the record, the accused may have objected to the law officer's reference to the cases; if he did, there was no necessity for a second objection when the recess was requested, even though cautious counsel might perhaps reiterate an objection. If defense counsel was unaware of the fact

**453**

that the court had been given cases to consider, he may not have understood the significance of the president's remark. Therefore, his failure to object can only be regarded in its broadest sense as consent to a recess to allow the court to consider the Manual references and to "sleep on the matter." Under the circumstances, we find that the accused's failure to object did not amount to a waiver of his rights in the premises. Furthermore, to ■■■■ permit the court to separate and go home after arguments had been concluded and the law officer had completed his instruction for the purpose of studying cases and considering them in their deliberations on the findings, in and of itself, is so dangerous a practice that we are inclined to look upon it as reversible error.

In view of our determination of prejudice in regard to the second assignment of error, we need not consider the accused's further claim of error in connection with a closed session conference between the law officer and the court, which took place during the sentence procedure.

The decision of the board of review is reversed. The findings of guilty are set aside, and a rehearing is ordered.

Judges LATIMER and BROSMAN concur.