UNITED STATES, Appellee

v

ROBERT K. McMAHAN, Sergeant First Class, U. S. Army, Appellant

6 USCMA 709, 21 CMR 31

710

711

712

No. 6600

Decided March 2, 1956

*Frederick Bernays Wiener, Esq.,* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Edward Duvall.*

*First Lieutenant Edward S. Nelson* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

GEORGE W. LATIMER, Judge:

The accused sergeant, McMahan, has been sentenced to be put to death. Despite his plea of not guilty, an Army general court-martial[1] sitting in Augsburg, Germany, found him guilty of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 50 USC § 712. In addition, he was convicted of wrongful possession of two ration cards, in violation of Article 92, Uniform Code of Military Justice, 50 USC § 686; misappropriation of a pistol, in violation of Article 121, Uniform Code of Military Justice, 50 USC § 715; and eleven days absence without authority, contrary to Article 86, Uniform Code of Military Justice, 50 USC § 680. With the exception of one minor change, both the findings and the sentence were affirmed by intermediate appellate authorities. The case is now before us for mandatory review, and the following errors have been assigned and argued by the accused's appellate counsel:

(1) The evidence is insufficient to support the findings of guilty of premeditated murder;

(2) The accused did not receive the effective assistance of counsel;

(3) The law officer's ruling which denied defense counsel the right to cite legal authorities to the court-martial during argument on the motion for finding of not guilty was prejudicially erroneous;

(4) The law officer's instruction with respect to intoxication was incorrect.

## II

Because the attack of real importance centers on the murder conviction and the death penalty, it is deemed unnecessary to set out the facts which surround the commission of the other offenses. In connection with the homicide, attention is directed to the fact that the accused admitted firing the shot which resulted in the death of the victim named in the specification. His

[1] CM 376524.

stated defense was that the killing was excusable for the reason that he slew his victim in the reasonable belief that the action was necessary to save his own life. Necessarily, then, much of the Government's evidence was not disputed by the accused. However, in order to consider the defense claim of insufficiency of evidence to establish premeditation, we find it necessary to recite chronologically all evidentiary items bearing on that issue.

Sometime during July 2, 1954, the accused, who was stationed in Munich, Germany, obtained five rounds of ammunition from the arms sergeant of his unit. On the following day, by falsely declaring that he had been assigned to guard a named prisoner, he succeeded in procuring a .45 caliber pistol. Thus armed, he absented himself without authority and proceeded to the neighboring town of Herrsching, where he enjoyed the intimate hospitality of a female companion for four days. Just before his departure from his companion's home, the accused, who appeared to be without funds, accepted a small sum from her, ostensibly to cover his transportation expenses.

During the period July 7, 1954, to July 10, 1954, the accused remained in Munich as the guest of another female companion. While staying in her home, he took full advantage of her generosity by accepting meals and entertainment without offering to pay for their value. On all prior similar occasions, he had unfailingly reimbursed her for the food and services furnished to him. On July 10, 1954, after unsuccessfully attempting to borrow twenty marks from the woman, the accused left her residence, voicing an intention to return to his organization for the purpose of securing funds.

Between two and three o'clock in the afternoon of the same day, a black Mercedes taxi operated by a man wearing an American Army uniform was seen proceeding down a thoroughfare near Hechendorf, Germany. Earlier, an automobile of similar description, and occupied by one or possibly two

men, had been observed in the same area. Shortly after three o'clock p.m. of that day, the accused, who appeared to be in an excited condition and unsure of his destination, purchased a railroad ticket at a station located northwest of Hechendorf. Approximately one hour later, he was seen sitting in a tavern at Utting, Germany, engaged in counting German coins of an estimated value of from thirty to forty marks. Agitated and nervous, he shortly thereafter hastily boarded a boat in Utting, disembarked at Herrsching, and immediately bought food and drink to the value of eighteen marks.

Sometime during the evening of July 10, 1954, the accused returned to the home of the first girl friend, this time bringing cognac and assorted foodstuffs. Apparently gratified to find the accused once more secure financially, she was hospitable to the point of permitting the sergeant to remain as her guest until he was finally apprehended on July 14, 1954. His personal effects, including a pistol and two detached and bloodstained shirt cuffs, were confiscated at that time.

On July 11, 1954, the body of the victim was discovered in a secluded forest area one or two kilometers southeast of Hechendorf. A black Mercedes taxicab, the property of the victim, was later found secreted in a clump of bushes near a side road northwest of Hechendorf. Bloodstains were discovered on both the front and back floor of the vehicle, as well as on the forward seat. Although German police searched the automobile and the area with considerable care, they uncovered no demonstrative evidence of substantial value. Medical expert witnesses determined that death had been caused by a bullet fired at close range through the right temple. From the deceased's jacket pocket investigators removed a billfold containing several currency certificates, but no coins of any kind.

A pretrial statement was obtained from the accused, but we will not refer to the facts stated therein, as he elected to take the stand in his own defense, and, testified in accordance with his earlier statement. He corroborated much of the Government's evidence, but his account of the shooting was an exculpatory one. According to his testimony, after leaving the home of his second female companion, he spent some time enjoying the pleasures offered by several Munich gasthauses. His source of funds for that adventure was a watch which he had kept hidden from his female consorts in his pocket, and which he later pawned to an unidentified person. Prompted by a desire for his first companion, he employed the deceased for the asserted purpose of transporting him to Herrsching. Although the fare agreed upon originally had been twenty-five marks, he was presented with an unexpected price increase produced by the victim's insistence on embarking on unauthorized side trips. An argument ensued over the increased cost, during which the driver drew a .25 caliber pistol from the car's glove compartment. Concerned for his life, the accused quickly drew his weapon, fired pointblank at the victim, and saw him slump forward in his seat. Momentarily stunned and frightened, he regained sufficient composure to drag the body to the side of the highway, wipe some of the blood from the front seat, and conceal the vehicle by leaving it near a sparsely traveled lane some miles away. He denied that he had removed any money from the body of the dead driver, and asserted that he had secured and cast away the latter's pistol. The remainder of his story parallels the testimony of Government witnesses, which traced his steps to the residence where he was apprehended.

Prosecution rebuttal evidence established that the victim was an elderly man of friendly and peaceful disposition, who at no time had been known to own or carry a pistol or other lethal weapon. It was also shown that, on the day of his death, he was seen to be in possession of a coin purse which he carried invariably during the hours he operated his taxicab. A thorough search for the purse was unproductive in results.

Turning to the issue of the sufficiency of the evidence to support the findings of guilty of premeditated mur-

**715**

der, we find that the defense offers a two-pronged argument. First, it is urged that because the proof establishes, at most, a felony murder, and not a premeditated one, the homicide conviction cannot stand. Because felony murder is not a lesser crime included within the offense charged, appellate defense counsel contend that the murder conviction must fall, for the prosecution's case is fatally at variance with the pleadings. As an additional attack in this area, it is urged that the evidence fails to establish a conscious purpose to kill. To support that contention, we are told that the concept of instantaneous premeditation has been erased from military law by Congress by virtue of Code language, which in simple terms denounces a premeditated design to kill. This is language, according to defense counsel, which, when interpreted properly, contradicts the notion of a purpose formed instantaneously. Taking into consideration the circumstance that the record indicates an impulsive shooting following a violent quarrel, the defense insists that the requisite premeditation could only have been inferred from the instantaneous drawing and discharge of the pistol by the accused. This, it is concluded, is far too little to support findings of guilty of premeditated murder.

In reply to the first branch of the defense contention, Government counsel pose two hypothetical situations for the purpose of illustrating the fallacy in the defense argument. It is unnecessary that we set out and analyze the supposititious cases, as it should be apparent to even the uninformed that a person bent upon committing a robbery can also consciously and premeditatively plan to kill the possessor of the money. If he executes his conceived plan to rob and to kill, he is responsible criminally for either a premeditated murder or a felony murder.

Appellate Government counsel conclude that the present case falls squarely within the rule stated above. We are inclined to agree. Although this record of trial sheds little direct light on the circumstances surrounding the homicide, we find nothing whatever in it to suggest that the homicide had to arise out of the perpetration or attempted perpetration of a robbery without having been consciously conceived. Of course, it could have done so, but the record does not exclude a theory of premeditation. Nowhere in his pretrial statement, nor in his testimony from the witness stand, does the accused say or imply that he proposed to rob the deceased; in fact, he repeatedly denied that this was his intention, or that he had done so. Instead, his story was that the shooting occurred in self-defense occasioned by the victim drawing his own pistol during the course of a heated argument over the fare. Nor does the evidence adduced by the prosecution suggest that the accused planned to take the victim's property by less violent means than deliberately killing him. Certainly, the mere circumstance that a killer chose to rifle the pockets of the deceased person does not serve to negate a finding of premeditation. See United States v Goodman, 1 US CMA 170, 2 CMR 76. We, therefore, cannot say that the evidence is sufficient to support a charge of felony murder and nothing else.

We are equally unimpressed by the second prong of defense counsel's argument. In substance, it is to the effect that the evidence respecting premeditation fails to exclude every reasonable hypothesis other than that of guilt. Assuming arguendo that premeditation is impossible if the impulse to act is instantaneous, that hypothesis need not detain us in this instance. We are perfectly willing to make the foregoing assumption, for we are sure that ample facts were in evidence from which the members of the court-martial could justifiably have inferred that the accused had ample time and opportunity to form a premeditated design to kill.

It must not be overlooked that, prior to the homicide, the accused was without funds. He had previously obtained a weapon and ammunition, and left one woman companion for the avowed purpose of obtaining money. The sudden change in his fortune from poverty to

relative affluence within the short space of a few hours is too unusual to be ignored. Particularly is that significant when considered in the light of uncontradicted testimony to the effect that the victim customarily carried a change purse containing some fifty marks; that the accused was seen to be counting some forty marks in German coin shortly after the killing occurred; and that the accused possessed approximately fifty marks when he returned to his first companion. When those facts are weighed in conjunction with the accused's efforts to conceal his crime, together with the expert testimony that the deceased was shot without warning at close range, there is ample evidence of a calculated scheme to kill the unfortunate taxi driver for profit. Certainly, we cannot hold that the court-martial could not reasonably have found the existence of a premeditated intent formed well before the actual homicide.

We come now to the issue which gives us real concern. Again we are faced with a capital offense where the foundation for the findings and sentence is assailed by a contention that the accused was denied the effective assistance of counsel. In support of that position, defense counsel insist that the record reflects a callous indifference to accused's right to counsel during the pretrial, trial, and convening authority stages. Thus, it is asserted that the entire proceedings were of such a nature as to manifest a complete absence of judicial character. Significantly, this case arose and was tried in the same command as was United States v Parker, 6 USCMA 75, 19 CMR 201.

The charge leveled by this accused at the lawyer chosen to defend him is a serious one but it offers █ him an avenue of escape which "has its undoubted attraction to a disappointed prisoner." Diggs v Welch, 148 F2d 667, 670 (CA DC Cir) (1945). On many previous occasions we have rejected similar claims, for it is undeniably true that allegations of this nature too often are unsustainable and reflect no more than hindsight, or differences of opinion regarding a choice of tactics. United States v Hunter, 2 USCMA 37, 6 CMR 37; United States v Soukup, 2 USCMA 141, 7 CMR 17; United States v Bigger, 2 USCMA 297, 8 CMR 97. In view of those pronouncements, it would appear that a convicted accused in search of an escape hatch is unlikely to find this Court willing to assist him unless his claim of inadequate representation is well established by the record.

Conceding that many chimerical claims of improper representation are asserted, we cannot overlook the importance of an accused's right to the assistance of competent counsel during all phases of the proceedings against him. See Powell v Alabama, 287 US 45, 53 S Ct 55, 77 L ed 158 (1932). Article 27 of the Uniform Code, 50 USC § 591, commands the appointment of counsel for the defense of accused persons arraigned before both general and special courts-martial and that he be furnished with a capable counsellor is a fundamental protection which assumes even greater significance when the client's life is at stake. See United States v Parker, supra; Patterson v Alabama, 294 US 600, 55 S Ct 575, 79 L ed 1082 (1935). The uniformed accused, as well as his civilian counterpart, is therefore justly entitled to receive from his attorney a full measure of assistance.

Because of the emphasis placed by military commanders on the desirability of speedy trials in homicide cases, appointed defenders are placed in an awkward and sometimes embarrassing position. Many times a request for a continuance is frowned upon by military commanders as being merely delaying tactics. Some convening authorities give too little thought to the basic requirements of preparation, particularly of capital cases, and defending counsel by seeking time to prepare his defense may incur the disapprobation of his command superior. However, he has a solemn duty to defend unreservedly the interests of the accused he has sworn to protect, and fear of disfavor should not deter him from using all honorable means to protect his client's cause. No system of justice can flourish if the representation afforded an accused person is to be neglected because of fear of reprisal. Nor can mil-

itary justice succeed if those officers who must defend an accused inadequately protect him because they dare not assert every right guaranteed him by the Code.

Bearing in mind the preceding comments, we observe at the outset the total lack of any representation at the Article 32 investigation on the murder charge. The record discloses that on May 25, 1954, the accused was present during a pretrial investigation of the minor offenses of which he now stands convicted. The report of the investigating officer carrying that date notes expressly that the accused waived the right to the presence of counsel at the time of the interrogation of one witness, but that his lawyer was present during all other phases of the investigation. Two months later, however, when the accused was called on to face a capital offense, no counsel appeared to defend him, and the absence of a defense attorney during the five-day proceedings was accounted for in the second report of investigation by no more than the notations, "none" and "none requested." During this second pretrial hearing, twenty-seven witnesses testified against the accused, nine prosecution exhibits were offered in evidence, and eleven items of demonstrative proof were submitted by the Government. The accused made a number of incriminatory statements to the investigating officer and apparently they were made without the benefit of consultation with a professional advisor.

Although the right to counsel prior to the convening of a court-martial is of recent origin, it is nonetheless a substantial protection. See Article of War 46(b), 10 USC § 1517; Article 32(b), Uniform Code of Military Justice, 50 USC § 603; Humphrey v Smith, 336 US 695, 69 S Ct 830, 93 L ed 986 (1949). And its inclusion among the pretrial safeguards granted by the Code undoubtedly reflects Congressional dissatisfaction with the former practice of denying to a military accused person a champion before arraignment. Because we must afford each accused the benefit of legislation

sanctioning the presence of counsel during the Article 32 hearing, we have had occasion earlier to frown on "attempts to whittle it away by merely going through the formality of filling in the blank spaces on a form." United States v Parker, supra. In the present case we find testimony from which it may be inferred that the accused was present while some of the statements were obtained, but being untrained in legal proceedings or tactics, he could not hope to develop any leads from, or weaknesses in, the testimony of the Government witnesses. Had a lawyer been selected to probe into these possibilities, the defense attorney at the ensuing court-martial trial might well have been the beneficiary of some material which would have been of benefit to his client. Particularly is that true if counsel at the trial was not given ample time fully to investigate all points of the case. In short, in a capital case, we are not disposed to brush aside perfunctorily a defense claim that a lack of counsel during a pretrial investigation prevented him from defending himself adequately.

Of course, we are aware that the report of investigation now under consideration shows that the accused foreswore his right to counsel. If we were convinced that accused understood fully his right to have counsel and knowingly elected not to be represented, we would pay no heed to this claimed deficiency. United States v Rhoden, 1 USCMA 193, 2 CMR 99. However, certain matters found in this record cause us to be skeptical about whether this accused consciously chose to face his accusers alone. It appears inconceivable to us that one facing a charge of premeditated murder would deliberately forgo such a protection, especially when he had demanded representation at the pretrial hearing on the minor charges. Indeed, the situation is sufficiently doubtful to require us to look with a jaundiced eye toward the claim that the accused waived his right to have counsel assist him during the pretrial hearing. But more than that, we re-

718

peat the views we expressed in United States v Parker, supra:

"We have not overlooked the contention of the Government that counsel for accused waived many of the irregularities we have dealt with. Assuming arguendo that such is the case, waivers are seldom, if ever, relied on by appellate courts when a death sentence has been imposed. United States v Cramer, 137 F2d 888, 895 (CA2d Cir) (1943); Stephan v United States, 133 F2d 87, 90 (CA 6th Cir) 1943). Particularly is that true when the record bespeaks inadequate representation."

We would give no thought to reversal of the findings and sentence in this case solely on the basis of what has been said of the accused's want of professional representation during the pretrial investigation. However, subsequent portions of the opinion will demonstrate the presence of a collection of representational deficiencies, which leave us in no doubt of the direction our course must take.

In fairness to trial defense counsel we must say that the lack of representation we find in this case does not reach the level we found in United States v Parker, supra. There is something to be said in favor of the manner in which the defense counsel handled part of this case, but for some unaccountable reason, near the end he failed in his task. The record shows he excused a member of the court peremptorily, he appears to have contacted some witnesses before trial, he made a number of valid objections, he called witnesses to the stand to support the defense, and he submitted a motion for a finding of not guilty which was presented and argued in a very acceptable manner. As a matter of fact we would have little difficulty in overruling this assignment of error if it were not for the fact that as the case neared the end, he abdicated his duties in such a manner as to suggest he was figuratively pleading his client guilty.

The record discloses that on August 16, 1954, a specially constituted general court-martial was appointed for the trial of this accused only. This court-martial came into existence no more than a single day before his trial opened, and the record shows that the defense counsel designated by the new order of appointment had not served previously in that capacity before the command's regular, or standing, general court-martial. We do find, however, one reference in the record which indicates that prior to trial, defense counsel, in company with trial counsel, travelled to a nearby town to interview one witness. That suggests some activity by defending counsel prior to his appointment, but try as we may, we find nothing in the record which gives us a firm foundation to hold that the one-day period shown by the order was not the actual period of time afforded him to prepare his case.

It thus appears to us that additional time was required and that a motion for a continuance, which, in view of the capital nature of the charge, should have been granted, was in order. None was forthcoming, however, and defense counsel must have plunged blindly and hopelessly into what has been described as "an uncharted sea of court-martial procedure." We cannot say positively that a continuance was necessary to insure proper representation, but we can assert that the nature of the issues, the number of witnesses and their varying residences, and the necessity of seeking out some evidence to assist the accused in his attempt to escape the death penalty, would require considerable time and effort. Yet we are left to speculate as to whether more than one day was available to counsel to prepare his case. Under present conditions, the desirability of a speedy trial does not require that the defendant be rushed to his doom, and counsel should insist on ample time to investigate all avenues of defense. Furthermore, we note that in at least one other area counsel failed to employ acceptable trial strategy. He made no sort of attempt to examine any court member on voir dire, in spite of the sobering

**719**

nature of the charge, and the likelihood of advantage through probing the minds of individual members with respect to their views respecting the death penalty and their prior knowledge of the case. Moreover, the court was specially appointed for the one case, and it might have been profitable to ascertain whether there had been an orientation lecture prior to trial.

Following the swearing of the court, the reading of charges, and other preliminary matters, trial ■■■■■■ ■ counsel launched into an elaborate and highly effective opening statement, in which he outlined in detail the evidence massed against the accused. His vigorous remarks cover some six single-spaced legal-size pages of typescript record, and are couched in terms sufficiently forceful alone to guide the members of the court in the direction of conviction. Although he must have succeeded in creating an atmosphere unfriendly to the interests of the accused, the accused's lawyer offered no sort of reply at that time. If that was all we could point to, it would be unimportant, as many good trial lawyers prefer to make their opening statement at the time they begin their defense in chief. Quite often that is the preferable method of enlightening the jury. But here no opening statement was made at any time. Again, the failure to outline a theory or answer the Government's assertions would be relatively unimportant had a closing argument been made. But when consideration is given to the over-all lack of trial strategy, or technique of defense counsel, we find he permitted trial counsel to parade his side of the controversy before the court on two occasions, while the defendant's version was not championed.

However willing we may be to overlook the inactivity of the accused's lawyer during the early ■■■■■■ phases of the trial, we simply are at a loss to understand his almost audible silence at the conclusion of all the evidence. Briefly, the proceedings leading to this questionable default may be described as follows. Trial counsel examined witnesses, introduced exhibits, and produced documents designed to establish a motive for the homicide. Much of the proof introduced consisted of circumstances tending to show a premeditated killing. The accused then became a witness in his own behalf. He reiterated his pretrial claim of self-defense, asserted a spontaneous reaction to the victim's attempt to use a weapon, and emphatically denied that his want of funds had prompted the shooting. Although subjected to rigorous cross-examination by trial counsel and court members, his story remained reasonably consistent. In an effort to discredit his account of the homicide, trial counsel elicited a certain amount of testimony in rebuttal. Thereafter, the prosecutor, in a lengthy and able closing argument, drummed into the minds of the fact finders many of the inferences which could be drawn from the Government's evidence. In a most persuasive manner, he became a zealous advocate for a conviction of premeditated murder, and opposed the accused's claim of self-defense. In conclusion, he summed up his argument on the issue of accused's guilt in the following language:

"So, gentlemen, from all these facts and circumstances I think we have built a web, a noose, which has entrapped this accused which has made his story highly improbably [sic] and highly unbelievable."

Scarcely had the echo of this comment died away when the following surprising colloquy ensued:

"DC: I have no argument.
LO: The Defense has no argument?
DC: No argument.
LO: Has the Prosecution anything further to offer?
DC: [sic] Prosecution does not.
LO: Has the Defense anything further to offer?
DC: It has not."

Seldom, if ever, has an appellate court been faced with a more difficult task than ours, in trying to find a reason why defending counsel failed to support the cause of his client to the fullest

extent of his forensic ability. If we were to hypothesize many situations, we would encounter some difficulty in imagining a case in which the refusal of an attorney to utter a single word in behalf of his client, charged with a capital crime, was less justified. And, in this instance, we are sure that counsel's failure to undertake a closing argument served to convince the court members that he had no faith in the cause of the accused.

An accused's right to conscientious effort on the part of his counsellor operates to place squarely on the shoulders of the latter a duty to carry on even when the cause may appear hopeless. While he who defends must prepare, consult, examine and cross-examine opposing witnesses, and, if possible, produce evidence of his own, his duties do not end there. As important as any of those is the overriding necessity of presenting to the court members, by oral argument, the facts, circumstances and inferences in a light most favorable to an accused. · Except in unusual circumstances, a failure to do that is for all practical purposes an admission of guilt. Certainly, the presentation of a "jury argument" is a virtual cornerstone of the universal right to assistance of counsel. Collingsworth v Mayo, 173 F2d 695 (CA 5th Cir) (1949).

In United States v Sizemore, 2 USCMA 572, 10 CMR 70, a majority of the Court adverted to this principle in the following language:

"The right—and duty—of defense counsel to present a closing argument is not to be lightly brushed aside. Where the case is long and hotly contested and a planned strategy has been pursued by defense, the closing argument may be crucial. Out of the wealth of testimony adduced, defense must bring together the portions that are favorable to the accused and present them in a light that will appear most convincing to the triers of fact. If this is not done by defense counsel, there is a danger that the court may not understand or appreciate the defense theory. It is no exaggeration to say that many criminal cases are won for the accused in the course of closing argument. This is an important part of the protection guaranteed by the requirement that an accused in a criminal case be represented by counsel."

In the case at bar, however, no inference favorable to the accused was brought home to the triers of fact. Nothing was said concerning the accused's claim of self-defense or in regard to the presence of some element which might bring any lesser included offense into issue. Defense counsel by remaining silent seems to have confessed guilt of the principal charge as he made literally no attempt to reduce the degree of criminality by arguing the absence of premeditation. That issue was of such obvious importance to the Government that trial counsel devoted virtually his entire summation to it. We have suggested the presence of some points of argument, not necessarily because, as jurors, we would be inclined to find them persuasive, but rather to demonstrate our inability to understand why they should be conceded. There can be little reason for requiring instructions on an offense and its lesser degrees if defending counsel yields his opportunity to relate them to his theory of defense. Military law will not permit an accused to judicially admit a capital offense by way of a plea of guilty, and counsel ought not to conduct himself in a manner which will effect that result. Although this case may have appeared hopeless to defending counsel, it was not, and by his incomprehensible silence, he created just that impression, with the result that the accused was convicted of premeditated murder in short order.

In an effort to explain the silence of defense counsel, the Government's appellate attorneys argue that a court-martial composed, as was the instant one, of mature, field grade officers is not usually "squeamish" in the performance of a duty to declare that a murderer has forfeited his right to live. It is, therefore, urged that, before such a tribunal, "empty and ridiculous arguments are often considered as insults to intelligence and are thus

more harmful than beneficial." Government appellate counsel, therefore, conceive of nothing of value which might have been accomplished by a final argument addressed to this court-martial. Such a contention hardly merits a thoughtful answer. Suffice it to say that American standards of justice do not permit defending lawyers to waive to the gallows the person they have been chosen to protect. Even though an accused's story may not ring true, it is his counsel's solemn duty to present it in the best possible manner. Certainly, our attention has not been directed to any case in any civilian jurisdiction which has excused counsel's default simply because counsel chose to believe his attempts to save a life might be considered ridiculous.

In United States v Walker, 3 USCMA 355, 12 CMR 111, this Court unanimously reversed a murder conviction in which a defense attorney gratuitously demolished the accused's defense by conceding his guilt during the course of a closing argument. We held there that the conduct of the regularly appointed counsel was so unwarranted as to fall safely within the concept of incompetent representation. Certainly, the salutary rule announced in that case is applicable to the present one, for the refusal here of the defense lawyer to argue equated to an admission of guilt.

We are, of course, most critical of defending counsel when a life is to be forfeited, and if we have ▮▮▮▮▮ not yet shown enough to establish inadequate representation, there is more to follow. The last item of importance in this regard is the complete absence of any showing or argument with respect to the appropriateness of sentence. Evidence of no previous convictions was produced by the Government, yet when asked by the law officer if he cared to be heard, the accused's counsel once more left his client's fate to the court-martial with the cryptic comment, "We have nothing further." Here again we are faced with a surprising lack of a proper understanding of his assigned task. Why, we ask, did he have nothing to offer? Can it conceivably be that he

did not comprehend the serious nature of the charge, or the distinct probability that the death penalty would be adjudged, in the absence of any attempt to avoid it? If so, he failed his client utterly in the crisis. If, on the other hand, he recognized the gravity of the setting, but concluded the cause was not worth the effort and nothing should be done, then his omission is deplorable. Regardless of the reason for doing nothing, we conclude that, when an accused stands before a court-martial convicted of an offense for which the supreme penalty may be imposed, we cannot excuse the failure of his counsel to offer some small word in his behalf when the allied papers show competent evidence of a mitigating character.

An evaluation report from the accused's unit commander bearing date of June 8, 1954, some two months before trial, reveals that the accused had been awarded a variety of campaign ribbons, together with a Purple Heart. Moreover, over a service period of almost nine years, the appellant's military record was, until the present events, spotless. His service record and other official documents reflect no day of time lost, and indicate not a single instance of dereliction resulting in as much as company punishment. In the opinion of the accused's last commanding officer, the character of his service was entirely satisfactory. Certainly this evaluation report ought to have suggested to counsel a possible avenue of mitigation which might have been profitable to explore. If he could not have obtained a continuance, and a lack of time prevented further investigation in those areas, at least he could have brought the report itself to the attention of the court.

Furthermore, a report of examination by the chief neuropsychiatrist of the Army hospital in Augsburg certifies that, at the time of the homicide, the accused was in a state of "painful emotional tension," and notes the possibility that his judgment at the time of the homicide was impaired by the ·ingestion of alcohol. Although it must be stated in fairness that the accused was found to have been responsible

mentally, the reviewing psychiatrist concluded that the killing nevertheless appeared to have been impulsive. The report might have been helpful on the element of premeditation, but we will ignore that possibility at this time. In the opinion of the expert, as expressed in the report, the combination of emotional stress, plus the effects of alcoholic intake, should be considered in extenuation. However, since the report was not introduced in evidence, or mentioned in any particular by defense counsel, the court-martial was wholly unaware of its contents. Thus we find official records which show a good citizen and soldier committing a number of offenses in a relatively short period of time. As portrayed by them, his behavior pattern turns from good to bad in short order. Perhaps a psychiatrist might have shed some light on the mental disturbances, but, of course, medical evidence was not produced. Again, we cannot know what prompted the accused's lawyer to offer no evidence and remain silent when called on to speak, but we are without doubt that in failing to use the pertinent material contained in the report of psychiatric examination, he unfairly prejudiced his client.

Because this is a capital case, because we are not certain counsel was assigned at such a time and under such circumstances as to permit the giving of effective aid in the preparation and trial of this case, and because the cumulative effect of the omissions chargeable to the appointed counsel at the trial leaves us convinced that the accused was denied a fair trial, it is obvious that reversal is required. Because of that conclusion, no discussion of the remaining assignments of error is necessary to our action in the instant case. Accordingly, we express no opinion respecting the merits of those allegations. Chief Judge Quinn believes that had the accused been adequately represented, no offense lesser than unpremeditated murder would have been found. However, he is willing to join in my result to dispose of the case.

Although we have limited our consideration of this appeal to the facts and circumstances surrounding the murder charge, we are nonetheless sure that, for all practical purposes, all findings should be reversed. True it is that accused pleaded guilty to some of the minor violations, but insofar as the sentence is concerned, they played little, if any, part. So long as the Government is faced with the necessity of retrying the most serious offense, little additional time and effort will be used in rehearing all.

The decision of the board of review is reversed, and a rehearing is ordered.

QUINN, Chief Judge (concurring in the result):

As Judge Latimer points out, at the trial the defense counsel "made a number of valid objections, he called witnesses to the stand to support the defense, and he submitted a motion for a finding of not guilty which was presented and argued in a very acceptable manner." Judge Latimer concludes, however, that counsel's failure to make a closing argument and present evidence of mitigation deprived the accused of his right to the effective assistance of a qualified lawyer. In view of the overwhelming evidence of guilt, I would affirm a finding of unpremeditated murder. See United States v Best, 6 USCMA 39, 45, 19 CMR 165. However, in order to effect a practical disposition of the case, I concur in the result.